1
2
3
4
5
6

Law Offices of William D. Goldstein
William D. Goldstein (SBN. 279723)
4030 Sawtelle Blvd.
Los Angeles, CA 90066-5408
Phone: (310) 437-0108
Facsimile: (323) 372-3589
Email: wdgoldstein@wdgoldstein.com

Attorney for PLAINTIFF, RUNWAY TV, LLC.

7
8
9
10
11

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

12
13
18
15
16
18
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| RUNWAY TV, LLC., A Delaware Limited Liability Company | Case NO.: 2:18-CV-02503-FMO (JCx) |
| Plaintiff, | EXHIBITS IN SUPPORT OF FIRST AMENDED COMPLAINT |
| vs. | |
| EURL ELEONORA DE GRAY, a French Company; ELEONORA DE GRAY aka ELEONORA CHRISTENSEN, A French citizen And DOES 1-10, INCLUSIVE, | |
| Defendants. | |

– 1 –

EXHIBITS IN SUPPORT OF FIRST AMENDED COMPLAINT

Exhibit "A"

RUNWAY MAGAZINE ®

Official RUNWAY MAGAZINE ® website - International High fashion magazine known Worldwide. Trademarks registered: 4238028 ® RUNWAY , 4240206 ® Runway Magazine , 4044982 ® Runway Magazine , 4044985 ® Runway France .

News    About    SERVICES    Branding    Press Kits    Contact RUNWAY MAGAZINE    Terms

## About

# RUNWAY MAGAZINE ®

### www.RUNWAYMAGAZINES.COM

**1 000 000 readers a month**

RUNWAY MAGAZINE ® produced by Media Group ELEONORA DE GRAY.  MEDIA GROUP ELEONORA DE GRAY specializes on branding, marketing, strategy, image consulting, and media production. One of worldwide known commercial products is Runway Magazine designed to show and distribute most unique pieces, savoir-fair and expertise.

RUNWAY MAGAZINE ® is an American-French magazine, produced by Media Group ELEONORA DE GRAY, with the offices based in Paris (France), New York and Los Angeles. Runway Magazine started in 1995, in 2010 became ultimate luxury printed edition about trends, expertise, the most talented designers, photographers, artists, architects, showing the most amazing embroideries, exquisite cuisine, luxurious spa and much much more. It is a luxury printed book. Runway Magazine, printed luxury book and digital online platform hosted on www.RUNWAYMAGAZINES.com, exists on two languages : English and French.

1 000 000 readers a month!

RUNWAY MAGAZINE ® ultimate luxury magazine, 300 pages luxury editions produced and published in USA and France. Offices in USA located in New York and Hollywood, Los Angeles. Office (Headquarters) located in Paris, France. Managing partners: Eleonora de Gray – CEO and Editor-in-Chief, Guillaumette Duplaix – Executive Director. Trademarks registered in Europe.

Magazine presented and supported by Karl Lagerfeld, Jean-Paul Gaultier, Kenzo, Mila Jovovich, Claudia Cardinale and many other fashion designers and actors at different fashion and cinema events.

RUNWAY MAGAZINE ® featured in several movies and TV series.

Digitaly RUNWAY MAGAZINE ® distributed as Fashion News web-site www.RUNWAYMAGAZINES.com, RUNWAY News-Paper distributed in format of Nook by Barnes & Noble, Kobo by Fnac and other online platforms, and as an Application available on Google Play and Itunes.

Eleonora de Gray is French-American Founder of Media Group ELEONORA DE GRAY and RUNWAY MAGAZINE ®, Producer and Director of RUNWAY MAGAZINE ® talk show  – video episodes about fashion weeks in Paris, New York and Milan with exclusive interviews, broadcast on 40 TV channels in USA with Dish Network.She started her career in fashion more than 20 years ago as model, became known by Nivea and many other commercials.Today in partnership with one of the top color specialist in France Guillaumette Duplaix, who's known by her expertise and work with Chanel, Hermes and many other fashion houses, Eleonora de Gray created a company, media group with creative solutions in media,  outstanding solutions "out of the box" for branding, marketing strategy, fashion expertise, promotion, online media solutions and consulting. Company launched new line of fashion accessories.

RUNWAY MAGAZINE ® web-sites:
RUNWAY MAGAZINE Official Web-site: www.RUNWAYMAGAZINES.com
RUNWAY MAGAZINE Info: www.RUNWAYMAGAZINES.net

### Search This Site



### Translate

Select Language ▼

### News Archive

▼ 2018 (5)
  ▼ April (3)
      Mon RUNWAY SAC – Histoire d'une Photographe de Mod...
      The Urban Legend of St Louis
      Best of Fall Winter 2018 Paris – New York – Milan
  ► February (2)
► 2017 (18)
► 2016 (23)
► 2015 (32)
► 2014 (19)
► 2013 (24)
► 2012 (6)
► 2011 (9)
► 2010 (21)

### RUNWAY APP



### RUNWAY Partners

Exhibit "B"

# United States of America

### United States Patent and Trademark Office

# RUNWAY

**Reg. No. 4,449,667**
**Registered Dec. 17, 2013**

RUNWAY BEAUTY, INC. (ARIZONA CORPORATION), DBA RUNWAY
8637 E. BERRIDGE LN.
SCOTTSDALE, AZ 85250

**Int. Cl.: 16**

FOR: GENERAL FEATURE MAGAZINES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

**TRADEMARK**

FIRST USE 7-15-1989; IN COMMERCE 1-7-2002.

**PRINCIPAL REGISTER**

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-
TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NOS. 3,872,255, 3,964,775, AND 4,268,101.

SER. NO. 85-317,615, FILED 5-11-2011.

TRACY WHITTAKER-BROWN, EXAMINING ATTORNEY



Commissioner for Trademarks of the
United States Patent and Trademark Office

Exhibit "C"

Int. Cl.: 16

Prior U.S. Cls.: 2, 5, 22, 23, 29, 37, 38 and 50

United States Patent and Trademark Office

Reg. No. 3,586,631
Registered Mar. 10, 2009

## TRADEMARK
## PRINCIPAL REGISTER

# Runway Magazine

RUNWAY BEAUTY (ARIZONA CORPORATION)

8637 E. BERRIDGE LN.

SCOTTSDALE, AZ 85250

FOR: GENERAL FEATURE MAGAZINES, IN CLASS 16 (U.S. CLS. 2, 5, 22, 23, 29, 37, 38 AND 50).

FIRST USE 1-1-2002; IN COMMERCE 5-1-2007.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE "MAGAZINE", APART FROM THE MARK AS SHOWN.

SER. NO. 77-536,081, FILED 7-31-2008.

KATHRYN COWARD, EXAMINING ATTORNEY

Exhibit "D"

# *CONFIDENTIAL SETTLEMENT AGREEMENT*
## *AND*
## *MUTUAL RELEASE OF CLAIMS*

### TRADEMARK  LITIGATION
### *Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
### *2:09-cv-08333-JAK - JEM*

This Confidential Settlement Agreement and Mutual Release of Claims (the "Agreement") is made effective the **28th** day of October, 2011 (the "Effective Date"), by and between RUNWAY BEAUTY, INC., an Arizona corporation and Vincent Mazzotta and their entities and assigns (hereinafter "RBI") including any subsequent corporate name adopted by RBI, and RUNWAY MAGAZINE, INC., a California corporation and James Buccelli and their entities and assigns (hereinafter "RMI") including any subsequent corporate name adopted by RMI.  RBI and RMI each are referred to herein separately and/or collectively as "Party" and/or as the "Parties."

There are no other parties to this Agreement effective as of the "Effective Date" above.

WHEREAS, a dispute has arisen between the Parties relating to the use of the trade-name "Runway Magazine" and related terms and related names used in trade in connection with products and services offered by RBI and RMI; and, including website addresses, domain names, media files, names used in interviews and names used at events use these Parties.

WHEREAS, RBI filed suit against RMI in United States District Court for the Central District of California, Case No.2:09-cv-08333-JAK -JEM, and RMI has brought counterclaims and other affirmative claims against RBI in that case (hereinafter "California Action"); and,

WHEREAS, RBI and RMI believe that each has claims against each other in the United States (see California Action) and/or in foreign jurisdictions alleging trademark infringement and other claims, but to which neither Party has yet filed suit in these foreign jurisdictions (hereinafter "Foreign Rights"); and,

WHEREAS, both RBI and RMI applied to the U.S. Patent and Trademark Office to register trademarks containing "Runway Magazine"[1], and RBI has obtained registration of certain trademarks and specifically the trademark of "Runway Magazine."[2]

---

[1]     RBI's application filed on July 31, 2008 (Application No. 77536081) alleges 1st use 01/01/07 and 1st use in commerce 05/01/07; and, RMI's application filed on November 11, 2008 (Application No. 77/612008) alleges 1st use 01/01/95 and 1st use in commerce as 01/01/00

[2]     RBI obtained Registration No. 3586631 for "Runway Magazine" granted March 10, 2009.

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 2 of 13*

WHEREAS, both RBI and RMI each oppose the other's applications, but neither has asserted any counterclaims with the Trademark Trial and Appeal Board ("TTAB") rather choosing to adjudicate their disputes in the California Action.

WHEREAS, the Parties wish to resolve their disputes, including all claims brought by the Parties in the California Action, the Foreign Rights, and any and all claims the Parties have before the TTAB;

NOW, THEREFORE, with sufficient consideration in exchange for the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      Use of the "Runway Magazine" Mark:" The Parties have agreed to enter into this Agreement and the use of their respective Marks in the manner set forth herein. Except as provided herein RBI will as set forth herein ultimately permanently cease the use of the marks "Runway Magazine" and/or "Runway Magazine, Inc." ("RMI Marks") and RBI will use of the Mark "Runway" and "Runway TV" ("RBI Marks)  RBI will use the RBI Marks as much as possible and as quickly as possible, especially, after RBI obtains the trademark registration for "Runway."  The design, fonts and sizing of the Marks exampled by the samples submitted by the Parties in "Addendum A."

a.      It is the intention of the Parties that the ownership of the name "Runway Magazine" will reside with RMI and James Buccelli and their entities and assigns; and, that ownership of the name "Runway" will reside with RBI and Vincent Mazzotta and their entities and assigns.  The immediate use of "Runway Magazine" will reside with RMI and James Buccelli and their entities and assigns but it is understood by the Parties that it may take time for RBI to transition its use from "Runway Magazine" to "Runway" and when possible to effectuate the transfer of legal right and interest to RMI and James Buccelli and their entities and assigns. Therefore, the Parties understand that the trade-name "Runway Magazine" may take a period of years to effectively transfer it to with RMI and James Buccelli and their entities and assigns, but, it is the intention of the Parties by this Agreement to do so.

b.      It is the intention of the Parties at the present time to co-existing trademark registrations for use of the Mark "Runway Magazine."  (An example of which is attached as part of "Addendum A.")  The Parties agree to share the Mark within the boundaries of the United States for the next 18-months (the "Period") (starting on the Effective Date) as stated herein.

*Confidential Settlement Agreement & Mutual Release of Claims*
*TRADEMARK LITIGATION*
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 3 of 17*

(See below for use of Mark outside of the United States.)    Following the Period and except as stated herein, RBI will cease all use of "Runway" in conjunction with "Magazine" and will only use "Runway." During the 18-month period within the United States, RBI may as necessary and/or required to protect, secure and/or make use RBI's Marks in commerce continue RBI's use of RBI trademark registration of "Runway Magazine" for contractual purposes.  If required to continue use of the Mark "Runway Magazine" in commerce to protect, secure and/or make use RBI's Marks in the United States, RBI will when used in commerce only place any and all reference to the Mark "Runway Magazine" on the binder of any such publication and/or inside any such publication within the cover credits.  Additionally, see further terms and conditions agreed to by the Parties, directly, in Paragraphs "C1" and "C2" of Addendum "A" to this Agreement.

   c. Effective immediately, in all print, advertisements, and Internet, RMI agrees to use "Runway" in conjunction with "Magazine;" with "Magazine" to immediately follow "Runway" with nothing between the words.  RMI agrees that in all uses of "Runway Magazine", the font of the term "Runway" and "Magazine" must be identical.  RMI further agrees that in all uses of "Runway Magazine" that the font size of term "Magazine" must be no less the 1/4 of the font size of the term "Runway." This in no way affects the right of RMI to use "Runway" with other words as exampled by but not limited to such trade-names (and/or Trademarks) as "Runway Magazine TV," "Got Runway,"  "Runway Today." "Runway Report" and "Runway Fashion TV."  And, RMI may use the abbreviation of Magazine to "Mag" but not in a logo format.. Similarly, this in no way effect the right of RBI to use "Runway" with other words as exampled by but not limited to its trademarks and other names such as "Runway News" and "Runway Beauty."  If the Parties intend to use the term "Runway" in connection with an additional term not stated within this Agreement and not in a manner described in this Agreement, the Parties must provide written notice fourteen (14) days prior to such use.  Written notice must be in the form of E-mail (to ceo@runwaybeauty.com) and fax to RBI, and/or by E-mail (to runwayjames@gmail.com) and fax to RMI.  The Party giving notice must confirm receipt by telephone and written memorial of that confirmation by same method using E-mail and fax as stated above.

   d. Effective immediately, in all print, advertisements, and Internet, RMI shall agree to discontinue any and all uses of "Runway TV".  RMI agrees not to challenge the validity of RBI's U.S. Trademark Reg. 3,872,255 for "Runway TV." In turn, RBI agrees to allow RMI to use the exact phrases "Runway Magazine TV" and "Runway Fashion TV."   RMI further agrees that in all uses of "Runway Magazine TV" and "Runway Fashion TV," that the font size of any term following "Runway" must be no less the 1/4 of the font size of the term "Runway." The Parties agree to not to use their respective agreed upon trade-names of "Runway" for and by RBI

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 4 of 17*

and "Runway Magazine" for and by RMI with the use of any nominal letter, symbol and/or numbers in their respective trade-names "Runway" (such as "Runway the Magazine") and "Runway Magazine" (such as "RunwayfTV") not agreed to herein that results in confusion.  If a Party believes any such confusion has occurred than written notice must be given consistent with the method of notice stated in Paragraph "1-c." above.

        e.      Under this settlement RMI will submit applications to the U.S. Patent & Trademark Office ("USPTO") for use of the Marks "Runway Magazine" and/or "Runway Magazine, Inc."  RBI hereby consents to these applications and RMI's use of the RMI Marks; and, RBI will provide the USPTO with written consent to RMI'S use of and obtaining registration of these Marks with the USPTO.  RBI will provide RMI or its successors or assigns and the USPTO with whatever assistance and/or documents which are necessary for RMI to obtain registration of these RMI Marks.

        f.      RBI has filed various trademark applications with the USPTO, including but not limited to U.S. Serial No. 85317615 (the "'615 Application") for "Runway".  The '615 Application has received a suspension in view of U.S. Serial No. 77-612008, owned or controlled by RMI or its successors or assigns.  RMI agrees to provide RBI a written consent and to fully cooperate with RBI's use of and obtaining registration of the '615 Application and any other future application filed by RBI or its successors or assigns for the mark "Runway." RMI will provide RBI and the USPTO with whatever assistance and/or documents that are necessary for RBI to obtain registration of these Runway Marks.

        g.      It is the intent of the Parties to include in this settlement these Marks' use in or as a trademark, logo, trade name, or corporate name or portion thereof in any way and in any channel of distribution, in the United States and throughout the world.  Notwithstanding the foregoing  18-month period within the United States, , RBI may as necessary and/or required to protect, secure and/or make use RBI's Marks in commerce continue RBI's use of the Mark "Runway Magazine" outside of the United States for contractual purposes.  If required to continue use of the Mark "Runway Magazine" in commerce outside of the United States to protect, secure and/or make use RBI's Marks, RBI will when used in commerce only place any and all reference to the Mark "Runway Magazine" on the binder of any such publication and/or inside any such publication within the cover credits.

        h.      Should either Party every obtain the rights to and/or use of the domain name www.runwaymagazine.com; the Parties agree to use their mutual use of said domain name solely for the purpose of redirecting traffic to their other websites.

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 5 of 17*

i.      If there are any domain names that these Parties agree to transfer between them as set forth in the attached "Addendum A" as of the Effective Date of this Agreement or thereafter, the assignor will execute any required "Domain Name Assignment"  required for assignment of the domain name to the assignee.  Each Party further agrees to change any and all administrative records for any assigned domain names and to list the individuals and/or entities designated by the other Party as the "Administrative Contact."  Each Party further agrees to perform all actions necessary to maintain ownership of any existing registrations of domain names to be assigned and to retain all legal rights necessary to fulfill the obligations set forth in this paragraph.

j.      As of the Effective Date of this Agreement, both Parties agree to not obstruct and/or prevent the distribution of the products of the other Party, including but not limited to any relations existing or to be established with any and all distributors, resellers, marketers and business builders (herein collectively referred to as "Distributors").

k.      To the extent required under this Agreement both Parties are contractually required under this Agreement to cooperate with Distributors and when required to inform Distributors that they have no objections to the promotion and sale of the other Party's publication(s) by Distributors.

l.      To the extent necessary and/or required by the contractual obligations the Parties have with any Distributors, each Party shall inform its Distributors that it has entered into a settlement agreement with the other regarding the use of the Marks addressed herein; and, that the Party has acknowledged the validity of the other Party's Marks, and will provide Distributors with any written release required by Distributors arising out of future use of these Marks.  This Agreement is confidential and neither Party is to release a copy of the Agreement to any third party without the prior written consent of the other Party and/or unless the Party has obtained a Court order authorizing the release of this Agreement and/or the Party is required to provide a copy of this Agreement by law.

m.      The Parties will not sell or otherwise transfer any ownership or other rights in the RMI Marks, including any rights in domain names containing the RMI Marks expect as specifically authorized under this Agreement; and/or, with the written mutual consent of both Parties.  Reasonable consent may not be withheld.

n.      Attached as part of "Addendum A" is a copy of the proposed use of the Mark by RMI and a copy of RMI's proposed magazine in its entirety.  Also included in "Addendum A" are the Parties comments and agreements between themselves as to the use by the

*Confidential Settlement Agreement & Mutual Release of Claims*
*Trademark Litigation*
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 6 of 17*

Parties and the proposed magazine by RMI.

      2.    The Parties further agrees to perform all actions necessary to maintain ownership of the existing registrations for the Marks and/or related domain names and to retain all legal rights necessary to fulfill the obligations set forth in this Agreement.

      3.    The Parties further agree to immediately dismiss with prejudice all claims, counterclaims, or other legal proceedings in whatever form or forum that either Party has brought for cancellation of any U.S. or foreign trademark registration issued to either Party containing the terms "Runway Magazine."  Upon execution of this Agreement the Parties agree to immediately direct their respective counsel to dismiss with prejudice and without costs to either Party all actions each has filed and claims each has asserted against the other in accordance with local law and procedure.  **This Agreement represents a full, final and complete settlement of all the existing disputes between these Parties.**  The Parties agree to cooperate with each other in promptly completing all acts and executing all documentation necessary to effect such withdrawals and dismissals immediately following the Effective Date of this Agreement.

      4.  Acknowledgment of Validity of the Parties' respective Marks as described herein: The Parties and successors in interest hereby recognize and acknowledge RMI's ownership rights in and to the trademark "Runway Magazine" worldwide, inside the United States and outside the United States as specifically stated herein; and, all of the goodwill associated therewith. The Parties and successors in interest hereby recognize and acknowledge RBI's ownership rights in and to the trademark "Runway" worldwide, inside the United States and outside the United States as specifically stated herein; and, all of the goodwill associated therewith. Further, the Parties acknowledge and agree that the "Runway Magazine" trademark at issue in the California Action arising from RBI's application and the United States Trademark Registration No. 3586631 granted March 10, 2009, and all other foreign and domestic registrations and/or applications comprising or incorporating the use of "Runway Magazine" in commerce are famous, valid, enforceable, subsisting and owned by RBI and RMI as expressly stated herein.  The Parties agree to publicly acknowledge the validity of their "Runway Magazine" Trademarks as necessary for each individual occasion and/or event under this Agreement that arise, and, only as necessary in a joint  mutual statement as hereinafter provided for in "Addendum A."

      a.    Each Party and their successors in interest hereby recognize and acknowledge the ownership rights in and to the trademarks addressed in this Agreement worldwide and all of the goodwill associated therewith.

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 7 of 17*

    b. Each Party and their successors in interest and present and future subsidiaries agree not to hereafter challenge or contest, directly or indirectly, the validity, ownership or registration of any trademark under this Agreement including in any proceeding of any type in any country.

   5. No Payment(s): Under this Agreement the Parties agree and acknowledge that no sums of money are owed and/or due to the other Party under this Agreement.  And, each Party agrees and acknowledges that they are each solely responsible for all their legal fees and any and all costs and expenses incurred.

   6. License: The Parties agree that if necessary to execute any licensing agreement(s) consistent with this Agreement that the other Party may require to effectuate this Agreement and that Party's rights and/or interests under this Agreement, and/or required to enter into any contractual relationship with any third party to make use of that Party's rights and/or interests under this Agreement.  No Party shall seek any such licensing agreement that will adversely impact the other Party's rights and/or interests under this Agreement, nor, shall a Party be required to sign any such licensing agreement that would damage that Party's rights and/or interests under this Agreement.  No Party is required to execute any licensing agreement that may expose that Party to liability, but, may not unreasonably refuse to execute any licensing agreement due to exposure to liability if the other Party agrees in writing to fully indemnify the other Party and provides written proof of their ability to so indemnify.

   7. Covenant Regarding Past Damages: The Parties further hereby irrevocably and perpetually covenants not to sue the other, its successors in interest, its past, present and future assigns, officers, directors, subsidiaries, affiliates, insurers and underwriters, or otherwise seek recovery from such parties, for "Past Damages." "Past Damages" means any and all damages that have accrued on account of any and all trademark infringement that has occurred before the Effective Date.  In no event shall this covenant apply to any future violations of these Parties rights and/or interests under this Agreement.

   8. Releases: The Parties specifically release, waive, and forever discharge each other, their successors in interest, their past, present and future assigns, officers, directors, subsidiaries, affiliates, insurers and underwriters, from any and all past claims, demands, actions, liabilities and causes of actions, of every kind and character, whether asserted or unasserted, whether known or unknown, suspected or unsuspected, in law or in equity, for or by reason of any matter, cause or thing whatsoever, arising out of the claims asserted by the Parties in the California Action and/or from any past claims arising out of distribution of the publications using the "Runway Magazine" trade-name and/or Mark prior to the Effective Date of this Agreement.

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 8 of 17*

      9.     Dismissal of California Action: Upon execution of this Agreement the Parties shall direct their counsel to dismiss the California Action with prejudice, including all claims of RBI and all counterclaims of RMI and James Buccelli, each Party to bear its own costs, and with the form of agreed order attached hereto as Exhibit "A."

      10.     Confidentiality: The Parties agree to not provide any copy of this Agreement to any third party without the prior written consent of the other Party.  This Agreement is confidential and neither Party is to release a copy of the Agreement to any third party without the prior written consent of the other Party and/or unless the Party has obtained a Court order authorizing the release of this Agreement and/or the Party is required to provide a copy of this Agreement by law.

      11.     The parties agree to a "joint mutual statement " in the form attached hereto in "Addendum A."

      a.     Except for the joint press release provided in "Addendum A," and except for the release of this Agreement as agreed to by the Parties and/or as required by law, the Parties agree to keep confidential and not disclose to any third party the terms and conditions of this Agreement. The Parties may disclose the existence of this Agreement and the rights to use of the Marks involved and as stated herein.  The Parties will not disclose any of the negotiations and discussions that preceded this Agreement's making, except as follows in which cases the Parties will nevertheless use their best efforts to seek confidential treatment by any receiving party: (i) as is necessary to defend against any legal action; (ii) as is necessary to effectuate any term or provision of the settlement, including any subsequent litigation to enforce the settlement, except that both Parties shall take all reasonable steps to maintain the confidentiality of this information including filing documents under seal and entry of appropriate protective orders; (iii) to either Party's insurers, as necessary to pursue insurance claims; (iv) to a Party's accountants or lawyers; (v) as is reasonably necessary to comply with the Securities and Exchange Commission's disclosure requirements; (vi) as and to the extent deemed necessary by either Party in the course of their normal enforcement efforts with respect to their rights and/or interest in these Marks (whenever possible in such instances prior written consent of the other Party will be obtained, but, excused by emergent circumstances); and (vii) as required by law or court order upon notice to the other Party sufficiently in advance of such disclosure to permit it to seek a protective order. Nothing in this Section 11 shall be construed to preclude or prohibit the Parties from being able to publicly acknowledge that they have entered into a settlement of the California Action and related disputes.

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 9 of 17*

b.      The Parties acknowledges that the confidentiality obligations set forth herein are material considerations for each Party's agreement to enter into this settlement; and , that without each would not have entered into this settlement without such confidentiality obligations, and that any breach of the confidentiality obligations would be a material breach of this Agreement.

12.      No Admission of Liability: Each Party acknowledges and agrees that this Agreement is a compromise of disputed claims and neither this Agreement, nor any consideration provided pursuant to this Agreement, shall be taken or construed to be an admission or concession by either RBI or RMI of any kind with respect to any fact, liability, or fault.

13.      Waiver of Rights under *California Civil Code* §1542:  It is understood and agreed that this Agreement is intended to cover and does cover all claims or possible claims of every nature and kind whatsoever, whether known or unknown, suspected or unsuspected, or hereafter discovered or ascertained, and all right under Section 1542 of the *Civil Code of California* ("Section 1542") are hereby expressly waived. The Parties acknowledge that they are familiar with Section 1542, which reads as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

a.      The Parties expressly, knowingly, and intentionally waive and relinquish any and all rights that they have under Section 1542, as well as under any other similar state or federal statute or common law principle.

14.      Entire Agreement: this Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof and there are no inducements, representations, warranties, or understandings that do not appear within the terms and provisions of this Agreement. This Agreement may be modified only by a writing signed by both Parties.

15.      Defamation, Material Breach of Agreement & Attorneys' Fees: In the event of litigation between the Parties arising out of or related to the performance or non-performance of any obligation of any Party to this Agreement, the prevailing Party shall be entitled to recover its attorneys' fees and costs incurred.

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 10 of 17*

   a. Defamation: Each Party takes immediate initiative to take down all negative information and do not slander or imply negative information via; internet, in person or any other media and digital media means.  If either Party fails to remove such content under their control and/or posts any such content in the future; the Party in such breach of this Agreement is responsible for the other Party's costs, expenses and/or legal fees as damages incurred to address the offending material and to have it removed and/or responded to.

  16. Authorization: Each individual signing this Agreement warrants and represents that he has the full authority and is duly authorized and empowered to execute this Agreement on behalf of the Party for which he signs.

  17. Choice of Law: The provisions of this Agreement shall be governed by the laws of the State of California, including any action arising out of this Agreement.

  18. Severability and Construction: If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect. This Agreement has been negotiated by the Parties and their respective counsel and shall be interpreted fairly in accordance with its terms and without any strict construction in favor of or against either Party.

  19. Counterparts: This Agreement will be executed by the Parties on the Effective Date and may be executed in one or more counterparts, each of which when so executed and delivered shall be deemed to be an original, but all of which taken together form but one and the same instrument.

  20. The Parties agree that, should any controversy, claims or the breach shall arise, the Parties shall immediately make good faith efforts to negotiate its own written voluntary resolution of the matter directly between ourselves. The Parties agree that, if the matter still remains unsettled for twenty-five days after certified mail notification that a dispute exists, we shall immediately jointly retain a mutually-agreed neutral mediator, and conduct and participate in confidential mediation, to continue attempting to work out our own written voluntary settlement.

  The Parties further agree that if, and only if, the dispute still remains unsettled for an additional twenty-five days, then the Parties shall submit the dispute to binding neutral arbitration. In this event, the Parties agree that any controversy, claim, or the breach thereof, shall

*Confidential Settlement Agreement & Mutual Release of Claims*
*TRADEMARK LITIGATION*
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 11 of 17*

be settled by binding arbitration in accordance with the applicable rules of the American Arbitration Association then in effect as modified below.

The Parties stipulate and agree that no mediator shall submit, and no arbitrator, court, or other adjudicative body shall consider, any mediator evaluations, recommendations, declarations, or findings, unless all mediation participants specifically later agree in writing. The Parties agree that judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The Parties further agree that in any action, or arbitration claim, brought to interpret or enforce this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees and procedural costs.

LIQUIDATED DAMAGE CLAUSE FOLLOWS.

21.     Liquidated Damages: The Parties to this Agreement allege, assert, acknowledge and agree that determining damages is difficult, expensive and time consuming for any material and substantive breach of this Agreement and/or if either Party acts to cause injury to the other Party by placing items and/or information into any media (even if truthful), and therefore, the Parties agree to set the following liquidated damages to be awarded to the prevailing party in any legal action for any material and substantive breach and/or wrongful conduct described herein. Those liquidated damages are $500,000.00 (five hundred thousand dollars) for any such material and substantive breach and/or wrongful conduct and may be award  as provided in Paragraph 20. Additionally, the Parties must provided written notice as provided in Paragraph 1(c)  and the Party charged with material breach of this Agreement will have thirty (30) days to cure.

Initialed:

_____                    _____
Vincent Mazzotta, individually & for RBI          James Buccelli, individually & for RMI

[THE SIGNATURE PAGE FOLLOWS.]

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 12 of 17*

    21.    Binding Effect: This Agreement shall be binding on the Parties, their successors in interest, and present and future subsidiaries, assignees or acquirers, including any acquirer of substantially all of the assets of a Party.

    IN WITNESS HEREOF, RBI and RMI have caused their duly authorized representatives to execute this Agreement to be effective as of the Effective Date.

**By legal counsel as to form and content:**

**For Plaintiff and Counterdefendants:**

DATED:    October _____, 2011    By: _____
                                     Michael Cohen, Esq.

**For Defendants and Counterclaimant:**

DATED:    October 28, 2011    By: _____
                                     Bruce J. Tackowiak, Esq.

**By the Parties:**

DATED:    October _____, 2011    By: _____
                                     Vincent Mazzotta, individually and on behalf of Runway Beauty, Inc,; the Plaintiff and Counterdefendants

DATED:    October 28, 2011    By: _____
                                     James Buccelli, individually and on behalf of Runway Magazine, Inc. the Defendants and Counterclaimant

*Confidential Settlement Agreement & Mutual Release of Claims*
*TRADEMARK LITIGATION*
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 13 of 17*

### ADDENDUM "A"
**(Attached is Copy of Proposed Magazine & Cover by RMI)**

A.    Social Media & **Domain Names**

1.    RBI to transfer domains "RunwayMagazine.TV" to RMI.  RMI will not pursue "www.runwayfashionmagazine.com' and RBI agrees to not use that domain in and/or for any promotional manner and only use as a forwarding url.  RMI to pay for any and all costs associated with said transfers to RMI and RBi to pay for any and all costs associated with said tranfers to RBI.

      a.    RBI agrees to transfer the following "Runway Magazine" domains to RMI, including but not limited to:

        www.RunwayMagazine.biz(external link)
        www.RunwayMagazine.info(external link)
        www.RunwayMagazine.de(external link)
        www.RunwayMagazine.es(external link)
        www.RunwayMagazine.fr(external link)
        www.RunwayMagazine.it(external link
        www.RunwayMagazine.mobi(external link)
        www.RunwayMagazine.tv(external link)
        www.RunwayMagazine.us
        www.RunwayMagazin.com

        RMI to pay for any and all costs associated with said transfer.

      b.    RMI agrees to transfer the following domains to RBI:

        www.irunwaytv.com
        www.runwaytv.co

        RBI to pay for any and all costs associated with said transfer.

2.    Catch-All Provision:  With the exception of www.runwaybeautymagazine.com  any other domains that include the consecutive terms "Runway Magazine" domains owned by RBI to be transferred to RMI, after RBI is finished with whatever legal matters involving

Exhibit "E"



# THE SUPERIOR COURT OF CALIFORNIA
## COUNTY OF LOS ANGELES

Español | Tiếng Việt | 한국어 | 中文 | հայերեն

Search

| Home | Online Services | Forms, Filings & Files | Self-Help | Divisions | Jury | General Info |
|------|-----------------|------------------------|-----------|-----------|------|--------------|
|      | Pay Fines, Search Records... | Forms, Filing Fees... | Self-Rep, Info, FAQs... | Civil, Criminal, Family... | Jury Duty Portal, Q&A... | Courthouses, ADA ... |

❯ *Criminal*

 ✦ Criminal Home

ONLINE SERVICES

# Search for Case Number by Defendant Name

 Q & A   Logout

| Disclaimer | Show |
|------------|------|

**The following list might contain records of different people of the same name, and it may not contain records of the person for whom you are searching.**

> **IMPORTANT**
>
> Effective Monday, November 23, 2015, this site will return only the case number, defendant name, filing date and filing location of cases that match the party name you submitted. To view additional information about a case, please visit our Criminal Case Summary site.

**Result of query on Sunday, July 22, 2018   4:44:32 PM**

**Last Name:** Buccelli *(Exact Match)*
**First Name:** James *(Exact Match)*

New Search

| # | Name | Def. ID | Case Number | Filing Date | Filing Location |
|---|------|---------|-------------|-------------|-----------------|
| 1 | BUCCELLI, JAMES | 01 | 3PY08326 | 11/19/2013 | Van Nuys Courthouse West (LAV) |
| 2 | BUCCELLI, JAMES | 01 | 5PY03041 | 06/11/2015 | Van Nuys Courthouse West (LAV) |
| 3 | BUCCELLI, JAMES | 01 | 8VY02171 | 05/07/2008 | Van Nuys Courthouse West (LAV) |
| 4 | BUCCELLI, JAMES ANTHONY | 01 | LA081519 | 11/23/2015 | Northwest District (XNW) |
| 5 | BUCCELLI, JAMES ANTHONY | 01 | 4WA32632 | 11/06/2014 | Airport Courthouse (LAX) |
| 6 | BUCCELLI, JAMES ANTHONY | 01 | SA056848 | 09/19/2005 | West District (XWE) |
| 7 | BUCCELLI, JAMES ANTHONY | 01 | LA062917 | 08/28/2009 | Van Nuys Courthouse West (LAV) |

| 8 | BUCCELLI, JAMES ANTHONY | 01 | LA081519 | 08/06/2015 | Van Nuys Courthouse West (LAV) |
| 9 | BUCCELLI, JAMES ANTHONY | 01 | 4SM03467 | 07/21/2004 | Airport Courthouse (LAX) |
| 10 | BUCCELLI, JAMES ANTHONY | 01 | SA056848 | 06/22/2005 | Beverly Hills Courthouse (BH) |
| 11 | BUCCELLI, JAMES ANTHONY | 02 | BA284046 | 05/25/2005 | Clara Shortridge Foltz Criminal Justice Center (LAC) |
| 12 | BUCCELLI, JAMES ANTHONY | 01 | 7PR02618 | 05/18/2017 | Unknown (REV) |
| 13 | BUCCELLI, JAMES ANTHONY | 02 | SA055089 | 03/09/2005 | West District (XWE) |
| 14 | BUCCELLI, JAMES ANTHONY | 02 | SA055089 | 01/19/2005 | Beverly Hills Courthouse (BH) |
| 15 | BUCCELLI, JAMES ANTHONY | 01 | 8PR00234 | 01/11/2018 | Unknown (REV) |
| 16 | BUCCELLI, JAMES ANTHONY | 01 | 8VW01163 | 01/11/2018 | Van Nuys Courthouse West (LAV) |

Print This Page

New Search

✦ Criminal Home

Art Showcased in
Los Angeles Courthouse Jury Rooms



"New York" by Samantha Wei
2008 Honorable Mention



Privacy Statement    |    Disclaimer    |    Employment    |    ADA    |    Holidays    |    Comment on our Website                    Copyright 2014 Superior Court of California, County of Los Angeles

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 14 of 17*

those domains; and should be accomplished within 18-months of the Effective Date. Additionally, RMI shall transfer any domains to RBI that may cause substantial confusion between the parties.; and the same for any domains owed by RMI to be transferred to RBI. RMI to pay for any and all costs associated with said transfers to RMI and RBi to pay for any and all costs associated with said transfers to RBI.

3.    RBI agrees to immediately release all claims to and/or holds and/or blocks placed on domains and websites at Go Daddy or any other social media sites in which domain names and/or address owned by RMI were suspended or taken down, specifically including but not limited to, RunwayMagazineLa.com, RunwayMagazineInc.com, RunwayMagazineTV.com. Both RBI and RMI have looked through each other's domains and have decided that with respect to the domains and names listed herein, both RMI and RBI do not have any issue; and, specifically concerning the future use of other domains and names the Parties approve RMI's use of "Runway Enterprises" and/or RBI's use of "Runway Media Group."

4.    "Facebook:" The Parties agree to reasonably use their resources to the best of their abilities to transfer RBI's "Runway Magazine" Facebook fan page to RMI and RBI to develop and use a "Runway" fan page. If for any reason the Parties are unsuccessful in having the "Runway Magazine" facebook fan page transferred to RMI as stated herein, RBI agrees to transfer the "Runway Magazine" facebook fan page to RMI after 18 months. Or if 25,000 total fans / likes / followers, are achieved on RBI's new fan page, RBI will transfer the old fan page to RMI. However, at no time shall RBI have any obligation to transfer the fans/likes/followers of RBI's old fan page. If the transfer to RMI cannot be made without the fans/likes/followers attached that will not prevent the transfer.

5,    "Twitter:" The Parties agree to reasonably use their resources to the best of their abilities to transfer RBI's "Runway Magazine" Twitter Account to just "RUNWAY;" and transfer the "Runway Magazine" Twitter to RMI. If for any reason the Parties are unsuccessful in having the "Runway Magazine" Twitter Account transferred to RMI as stated herein, RBI agrees to transfer the "Runway Magazine" Twitter Account to RMI after 18 months. Or if 7,000 total fans / likes / followers, are achieved on RBI's new Twitter page, RBI will transfer the old Twitter page to RMI. However, at no time shall RBI transfer the fans/likes/followers of RBI's old Twitter page. If the transfer to RMI cannot be made without the fans/likes/followers attached that will not prevent the transfer.

*Confidential Settlement Agreement & Mutual Release of Claims*
*TRADEMARK LITIGATION*
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 15 of 17*

6.      Other Social Media:

  a.      RBI agrees to kill "Runway Magazine" Behance completely and start over with just "Runway."

  b.      With respect to the Parties agreement for Facebook and Twitter: The Parties agree to similarly transfer any social media outlets that have the url / title "Runway Magazine," "Runway Mag" or "RunwayMagazine" in it that RBI is currently affiliated with and/or owner of, including but not limited to;

    i.) MYSPACE; ii.)YOUTUBE; iii.) STUMBLEUPON

  c.      RBI agrees to delete all old job postings under "Runway Magazine."

  d.      RBI agrees to change all business listings, yp, google, yahoo, msn, bing, local, etc…. from "Runway Magazine" to "RUNWAY."

7.      RBI agrees to change their "Runway Magazine" APP to just "Runway."

8.      The Parties agrees to do a walk through together with RMI of RBI websites and remove any and all things that state "Runway Magazine."

9.      RBI agrees to RMI using "Runway Magazine" and RBI using "RUNWAY" immediately.

B.      **Joint Mutual Statement**

  [See attached "Joint Mutual Statement " dated October 22, 2011.]

C.      **The Parties Agreed Upon Terms & Conditions, And, Regarding RMI's Proposed Magazine (Attached to This Agreement) and Use of The Mark "Runway Magazine.**

1.      Except as provided herein, after the 18-month transition period agreed to herein  RBI is not to use "Runway" and the word "Magazine" together within the United States, including but not limited to use in any publication, any domain or for any type of advertising and promotions;

2.      RBI will if possible, even during the 18-month transition period for use inside the United States, attempt to use "Runway [Media Group Magazine]" or "Runway [A Magazine]", except on use on the binder or inside RBI's magazine in the cover credits in order to not

*Confidential Settlement Agreement & Mutual Release of Claims*
TRADEMARK LITIGATION
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 16 of 17*

      adversely jeopardize RBI's U.S. or foreign trademark rights and registrations;

3.     Use of "Runway Beauty" in RMI magazine, please change to Runway Magazine Beauty;

4.     RMI will cease using "Runway TV" and may continue using "Runway Fashion TV" or "Runway Magazine TV";

5.     The Parties, both RBI and RMI are in agreement with shared use of the Mark "Runway Magazine as set forth in the settlement agreement through owning separate USPTO registration numbers; and, except as described herein, so long as RBI's use of the Mark "Runway Magazine" ends after the agreed upon 18-month period;

6.     The Parties have not and will not act to empower, assign and/or transfer to any third party the use of "Runway Magazine" for any promotional, social media, advertising, print, web/TV, or anything that asks for a profile name;

7.     Except as described herein, RBI will immediately start weeding out their use of name "Runway" and "Magazine" on existing social media. Also let his marketing and PR know not to use "Runway Magazine" but rather move forward using just "Runway;"

8.     Except as described herein, moving forward for this point in time, all Branding for RBI regarding their publication and TV in any facet is to be "RUNWAY;"

9.     Reveal of any pending legal matters and status that could effective the settlement between the Parties;

10.    Letter and/or written consent sent to USPTO releasing any opposition of RMI's existing trademark applications for "Runway Report," "Runway Magazine LA," "Got Runway;".similarly, releasing any opposition of RBI's existing trademark applications for "Runway;"

11.    RMI to use "Runway Report" when reporting on the news and RBI to use "Runway News" when reporting on the news;

12.    Starting from the effective date of this Agreement, in regards to any future data uploaded on any website or anywhere on the Internet, RBI will immediately cease and take steps to correct all keyword, meta-data and/or meta-tag stuffing of the combined terms "Runway Magazine" in all affiliated sites of RBI under its control. RBI shall not have an affirmative duty to remove past data, except, both RBI and RMI will have an affirmative duty to correct all keyword, meta-data and/or meta-tag stuffing of terms associated with each Parties primary web-site.

13.    Event of Default : If either parties corporate entity is dissolved, closed or shut down the surviving party shall be entitled to all the property listed in this agreement.

*Confidential Settlement Agreement & Mutual Release of Claims*
*TRADEMARK LITIGATION*
*Runway Beauty, Inc. v. Runway Magazine, Inc. et al*
*2:09-cv-08333-JAK -JEM*
*August 17, 2011*
*Page 17 of 17*

14.    To the extent the Parties cannot accomplish any of the requirements of Addendum A as a result or consequence of policies or regulations of third parties which are beyond the control of the either of the Parties, the respective Party's inability shall not constitute a breach of this Agreement.

**By the Parties:**

DATED:        October 29, 2011        By: _____
                                            Vincent Mazzotta, individually and on
                                            behalf of Runway Beauty, Inc,; the Plaintiff
                                            and Counterdefendants

DATED:        October 28, 2011        By: _____
                                            James Buccelli, individually and on behalf
                                            of Runway Magazine, Inc. the Defendants
                                            and Counterclaimant

Exhibit "F"

**Alex Padilla**
**California Secretary of State**

 Business Search - Entity Detail

The California Business Search is updated daily and reflects work processed through Friday, July 20, 2018. Please refer to document **Processing Times** for the received dates of filings currently being processed. The data provided is not a complete or certified record of an entity. Not all images are available online.

## C3016054　RUNWAY MAGAZINE INC.

| | |
|---|---|
| **Registration Date:** | 06/11/2007 |
| **Jurisdiction:** | CALIFORNIA |
| **Entity Type:** | DOMESTIC STOCK |
| **Status:** | FTB SUSPENDED |
| **Agent for Service of Process:** | JAMES ANTHONY BUCCELLI |
| | 8560 SUNSET BLVD, 5TH FLOOR |
| | WEST HOLLYWOOD CA 91604 |
| **Entity Address:** | 8560 SUNSET BLVD, 5TH FLOOR |
| | WEST HOLLYWOOD CA 90069 |
| **Entity Mailing Address:** | 8560 SUNSET BLVD, 5TH FLOOR |
| | WEST HOLLYWOOD CA 90069 |

| Document Type ⬍ | File Date ⬇ | PDF |
|---|---|---|
| SI-COMPLETE | 03/18/2014 | |
| SI-COMPLETE | 03/11/2011 | |
| REGISTRATION | 06/11/2007 | |

\* Indicates the information is not contained in the California Secretary of State's database.

- If the status of the corporation is "Surrender," the agent for service of process is automatically revoked. Please refer to California Corporations Code **section 2114** for information relating to service upon corporations that have surrendered.
- For information on checking or reserving a name, refer to **Name Availability**.
- If the image is not available online, for information on ordering a copy refer to **Information Requests**.
- For information on ordering certificates, status reports, certified copies of documents and copies of documents not currently available in the Business Search or to request a more extensive search for records, refer to **Information Requests**.
- For help with searching an entity name, refer to **Search Tips**.
- For descriptions of the various fields and status types, refer to **Frequently Asked Questions**.

| Modify Search | New Search | Back to Search Results |
|---|---|---|

Exhibit "G"

ARIZONA CORPORATION MINUTES RUNWAY BEAUTY INC

BOARD MEETING: 2-27-2015

Took Place at: Corporate HQ Arizona

Points:
*Let the record show that Mr. Jay Falz has committed suicide violating his contract to provide funding and work as CFO until Runway Beauty Inc is profitable therefore all shares of Runway Beauty Inc will revert back to its original ownership.

*New Ownership is 10,000 A Class of 10,000 A Class Shares to Vincent Anthony Mazzotta

*All Debt to be paid by Vincent Mazzotta in order to keep from losing the companies Intellectual property. Estimated Debt left by CFO Jay Falz: $40,000

*Runway Beauty Inc to be converted to a holding company for Intellectual property and Runway TV LLC is to be formed to run day to day operations and prepare the company to go public using the laws of Delaware.

Exhibit "H"

**From:** Eleonora de Gray [mailto:pomconfi2@gmail.com]
**Sent:** Tuesday, March 18, 2014 12:25 PM
**To:** michael@patentlawip.com; Runway Media <ceo@runway.net>
**Subject:** Eleonora de Gray - James Buccelli problem

Dear Michael,
Vincent suggested me to get in touch with your directly for the piece of my mind and 2 our teams in France and Peru who became the victims of Buccelli scam. we are all as you can understand today under attack

We are going to fix all the paper work needed this week with FBI and will send it to you. - so you can add to all files. if needed I can send to you fake license contract what I received from Buccelli in February 2012 ... when he didn't have any trademark even for temporary use. . I see he has change of ownership and registration of trademark valid ONLY for USA in December 2012.

I strongly believe that international trademarks RUNWAY / RUNWAY MAGAZINE belong to Vincent. and I strongly believe that we should do everything possible to get USA trademark also back to Vincent. Otherwise scam and fraud will never stop. There are two trademarks and they have to be in one corporation.
to protect my company production and get rid of all kind of fraudulent use of my production of James Buccelli I registered in France trademarks Runway France / Runway Magazine France .
and I suggested to do the same to company who produced Runway Peru.
I proposed Vincent and Jay corporation business model with community trademark (this business model often used in oil business where all small companies in corporation have their shares and sub-trademarks in their countries). I'm writing common e-mail to you , my lawyer , my business adviser, Vincent and Jay about this subject to see how we can go trough in the best business interest for all of us.

Dear Michael ,
I'd very much appreciate if you'll give me piece of mind about International Runway Magazine trademark: 1058209
as I can see on http://www.wipo.int/romarin
it's still belong to Vincent BUT I also see that James Buccelli filed "change of ownership" 25 February 2014
if there any possibilities to stop James from obtaining it based on the documents that Vincent signed after court.
and I think it's only you can file objection in proceeding for this "change of ownership" based on multiplied violations, fraud.
could you please let me know and if there's something I can do to prevent it from happening

thank you very much

have pleasant time
all my best :-)
Eleonora de Gray

EDITOR-IN-CHIEF of
RUNWAY MAGAZINE FRANCE
http://www.runway.net
http://runwayfrance.blogspot.com

Exhibit "I"

# RUNWAY

LIFESTYLE   BEAUTY   SHOPPING   POLITICS   ROMANCE



## 10 Reason why Sex Make you live Longer

**admin** - Mar 5, 2018                                                                    0



## Oscars 2018 – RUNWAY MAGAZINE WINNERS LIST

**admin** - Mar 5, 2018                                                                    0

Exhibit "J"

**Official RUNWAY MAGAZINE ®**

# RUNWAY MAGAZINE ® Official – High fashion magazine known Worldwide

**Iris van Herpen Haute Couture Fall-**

READ MORE

**Stephane Rolland Haute Couture**

READ MORE

**Franck Sorbier Haute Couture Fall-**

READ MORE

**Aigle x Ines de la Fressange**

READ MORE

**POURQUOI CHANEL A CRÉÉ I.A**

READ MORE

**Les premiers lauréats de**

READ MORE

**Versace Fall-Winter 2018-19 Milan**

READ MORE

**Local Ambition – Reality Show by**

READ MORE

**Royal Wedding 2018 – Harry and**

READ MORE

**Gucci Fall-Winter 2018-19 Milan**

READ MORE

**Story of Fashion Model – My Runway**

READ MORE

**Chanel Cruise 2018-19**

Chanel Cruise 2018-19 Replica

READ MORE

**Shiatzy**

**Mon**

**The**

Exhibit "K"

MULTI-MEDIA
LICENSE AGREEMENT
INTERNATIONAL EDITION

BUSINESS TERMS/SCHEDULES

1.          **AGREEMENT DATED AS OF:**     APRIL 1st, 2014

2.          **PARTIES:**

  Licensor:   Runway Media Group, LLC

  Licensee:   EURL Eleonora de Gray

3.          **TRADEMARKS:**     RUNWAY -/'magazine

4.          **LANGUAGE:**   ENGLISH / FRENCH

5.          **TERRITORY:**   FRANCE

6.          **NUMBER OF PRINTED SPECIALS LICENSED:**  NA

7.          **TITLE OF THE LOCAL MEDIA:**   RUNWAY    FRANCE    /
RUNWAY, FRANCE

                              Logo will be modified to include FRANCE
                              within it, or beneath it.

8.          **LAWS UNDER WHICH LICENSEE IS DULY ORGANIZED:**
United States

9.          **TERM:**   3 months/ 1 issue – This license is for testing purpose only

10.          **DATE BY WHICH THE FIRST ISSUE/FEED MUST BE
RELEASED:** May 2014

11.          **FEES AND ROYALTIES: $0 – no payment ever – test license**

         a.   An up-front one time non-refundable, non-recoupable fee of $ 0
United States dollars (US$ 0), to be received by Licensor within three (3)
business days of the signing of this Agreement, time being of the essence.
         b.   Broadcast feed monthly cost fee of $ 0 United States dollars (US$ 0 ),
for fully developed video feed in specified language.

                                                      i

c.    A royalty of three percent (_0%) of Licensee's gross revenue, which, for the purposes of this Agreement, shall be the aggregate cover price of all copies sold, all advertising revenue and all money made from usage of the trademarks and materials provided.  No costs incurred in anyway including but not limited to the manufacture, sale, distribution, filming, broadcasting, advertisement or promotion of the Local media or in the payment by Licensee of any taxes shall be deducted from the gross revenue or from any royalty payable to Licensor by Licensee hereunder.

d.    All royalties payable hereunder are due in full irrespective of Licensee's sales or advertising revenue, Licensee's failure to publish or distribute issues/feeds/broadcast as required by this Agreement, and any reductions or discounts off rate card rates granted by Licensee to advertisers, or any failure by any subscriber, distributor, broadcast partner, advertiser or other third person or entity to pay.

12.            **BANK INFORMATION FOR WIRE TRANSFERS**:    NA

13. **LIST    OF    THE    BENEFICIAL    OWNERSHIP, DIRECTORSHIPS AND OFFICERS OF        LICENSEE:**

14. **ADDRESS FOR NOTICES:**

To Licensor:          **Runway Media**
                      **4413 N. Saddlebag Trail #1**
                      **Scottsdale, AZ 85251**

To Licensee:      Eleonora Christensen
    Title:        CEO
    Company:      EURL Eleonora de Gray
    Address:      2, sq du Nouveau Belleville, BL5
    City:         Paris
    State:
    Zip:          75020
    Country:      France
    Telephone:    ⁻33660329401
    Facsimile:

              SIREN 539 884 783
              VAT FR 6253988478300017

15.   **GOVERNING LAW:**        **United States of America**

ii

**DEFINITIONS:**          Each defined or capitalized term used in the foregoing
                   Business Terms/Scheduled shall have the meaning ascribed to
          such term in the Standard Terms and Conditions annexed                 hereto.


(Licensor)

BY: Runway Beauty Inc DBA RUNWAY MEDIA

NAME: Vincent Mazzotta

TITLE: CEO

Date: 4 - 14 - 2014




(Licensee)

BY: _____EURL ELEONORA DE GRAY_____

NAME: _____ELEONORA CHRISTENSEN_____

TITLE: _____CEO_____

Date: _____02 APRIL 2014_____


iii

**MULTI-MEDIA LICENSE AGREEMENT**

**INTERNATIONAL EDITION**

**STANDARD TERMS AND CONDITIONS**

iv

Table of Contents

I.      The License.................................................................1

II.      Term.......................................................................4

III.      Royalties   and   Fees..................................................
       .......5

IV.      Territory..................................................................6

V.      Quality Standards and Controls.......................................7

VI.      Use of Material from the magazine/broadcast Other Local Editions/
       This Local Edition................................................10

VII.   Advertising................................................................12

VIII.      Termination............................................................12

IX.      Indemnification........................................................14

X.      Miscellaneous Provisions:

          A.      Assignment of Agreement....................................15

          B.      Notices.........................................................16

          C.      Injunctive Relief..............................................16

          D.      Severability....................................................16

          E.      Entire Agreement..............................................16

          F.      Governing Law................................................16

          G.      Non-waiver of Rights.........................................16

          H.      Counterparts...................................................17

          I.      Non-compete...................................................17

          J.      Other Licenses.................................................17

          K.      Trademark Notice.............................................17

          L.      Copyright Notice..............................................17

          M.      Force Majeure.................................................17

v

N.      Survival..................................................................18

O.      Binding Agreement............................................18

EXHIBIT 1:

        Trademark Statements..............................................19

EXHIBIT 2:

        U.S. Magazine...................................................attached
        U.S. Broadcast Feed............................................Via Internet

EXHIBIT 3:

        Model Release, Authorization and Agreement.....................21

vi

MEDIA AGREEMENT
LICENSE AGREEMENT
INTERNATIONAL EDITION

<u>STANDARD TERMS AND CONDITIONS</u>

LICENSE AGREEMENT made and entered into as of the date set forth in Schedule 1 of the Business Terms attached hereto between the licensor and licensee set forth in Schedule 2 of the Business Terms attached hereto ("Licensor" and "Licensee").

WHEREAS, Licensor owns and publishes/Broadcast and licenses worldwide RUNWAY ("Magazine") and Runway TV in the English Language in the United States of America and circulates the Magazine in the United States, Canada and other countries; and broadcast RUNWAY TV by internet feed worldwide.

WHEREAS, Licensor has a number of relationships in various countries throughout the world providing for the publication of various local international editions of the Media sources;

WHEREAS, Licensor is the owner of the trademarks and/or service marks set forth in Schedule 3 of the Business Terms attached hereto ("RUNWAY "magazine")

WHEREAS, Licensor is the owner of the format, style, bylines and images of the Broadcast/ Magazine, and certain articles, segments, shows, photographs and other editorial and artistic material prepared by or for Licensor for the Broadcast/Magazine (collectively "Materials");

WHEREAS, Licensor is in possession of, and has the power to procure, realized knowledge and information acquired through the result of trial and error and enhanced by technical breakthroughs in connection with the publishing/broadcasting of the feed and other publishing/broadcasting generally ("Know-How");

WHEREAS, Licensee has the facilities and financial ability to create, produce, broadcast, publish and distribute an edition of the Magazine/Channel in the English language and in the territory set forth in Schedules 4 and 5 of the Business Terms attached hereto, respectively ("Language" and "Territory"); and

WHEREAS, Licensee desires to obtain a license to use the Trademarks, Materials and Know-How for the publication/broadcast of an edition of the Magazine/channel for distribution in the Language and in the Territory ("Local Edition"), and Licensor desires to grant to Licensee a license for such publication and distribution on the terms and conditions set forth below;

NOW, THEREFORE, in consideration of the promises and mutual covenants contained in this Agreement, the parties agree as follows:

1. <u>THE LICENSE</u>

    a. Licensor hereby grants, and Licensee hereby accepts, a license to use the Trademarks, Materials , assigned domain and Know-How for the creation,

1

publication, promotion, distribution and sale of a monthly Broadcast/Magazine and up to the number of additional magazines per year, if any, set forth in Schedule 6 of the Business Terms attached hereto using the RUNWAY name, for which at least thirty (30) calendar days written notification prior to the on-sale date of each additional magazine shall be given to Licensor ("Specials"), in printed magazine format in the Language and in the Territory during the Term of this Agreement as set forth below. Licensee may not publish a greater number of Specials for publication and distribution than are licensed hereunder without Licensor's prior written permission. Licensee shall diligently and continuously use and exert its best efforts throughout the Territory and during the Term to distribute and sell issues of the Local Edition (as hereinafter used to include "Specials"), to make and maintain adequate arrangements for the distribution of the Local Edition, and to promote and expand their sales hereunder to the highest levels possible. In its efforts to promote and expand sales of the Local Edition as required hereunder, Licensee shall have the right to manufacture and distribute pre-approved goods as promotional premiums to clients and advertisers bearing the Trademarks and/or Materials. Licensee understands, however, that it shall not sell, distribute, market or otherwise dispose of such goods in large quantities to one individual or entity or for consideration or in exchange for any purchase price, compensation or other thing of value, revenue or income for any reason whatsoever. Prior to distribution of any such goods, Licensee shall furnish Licensor with a sample of each product manufactured for distribution hereunder and shall not distribute same unless and until it receives Licensor's written approval, which shall be given, if at all, in Licensor's sole discretion, within ten (10) business days of Licensor's receipt of each such sample product. Licensor's silence as to any submitted product shall not be deemed consent but rather, in any such instances, permission shall be deemed denied.

b.   The title of the Local Edition shall be as set forth in Schedule 7 of the Business Terms attached hereto. The titles of Specials shall be established by Licensee but require Licensor's approval. To such end, prior to the publication of any Special licensed hereunder, Licensee shall submit to Licensor for its written approval the proposed title of such Special. Licensor shall then have five (5) business days from the date on which it receives each proposed title to approve or disapprove same in writing. Licensor's silence as to any title shall not be deemed consent but rather, in any such instances, permission shall be deemed denied. If Licensor so requests, Licensee shall register, on Licensor's behalf and in Licensor's name, any title used hereunder as a trademark in the Territory.

c.   Licensee acknowledges that some of the editorial or graphic material in the Magazine/Broadcast may not be available for use in the Local Edition without securing permission from the copyright owner(s) to publish such editorial material in the Language in the Territory. The securing of permission from the copyright proprietors to publish editorial material from the Magazine, in the Language, in the Territory, and any required payments of additional royalties or fees, shall be borne solely and exclusively by Licensee. Licensor makes no promises or representations that any copyright proprietor will grant the requested permission.

2

d. Licensee agrees to secure copyrights and follow all rules under the locally applicable laws, conventions and treaties in the name of Licensor in each and every issue of the Local Edition/broadcasts in all countries comprising the Territory, and to forward to Licensor copies of all such copyright applications when filed and final registrations once obtained. Licensee further agrees not to permit any act or omission whereby such copyright protection will be impaired with respect to any of the material in the Local Programming. On termination or expiration of this Agreement for any reason, the rights, including any copyrights, that Licensee has secured relating to any Material appearing in the Local Edition shall automatically be transferred to Licensor, in which case this Agreement serves as the instrument of transfer, in addition to, and not in limitation or derogation of, the obligation to provide all necessary documents, as described in Section 1. Paragraph h. and Section 5. Paragraph j. herein.

e. Licensor grants no license to Licensee to any Trademark, Material or Know-How for any purpose other than that specifically described in this Agreement, and Licensee may not use such elements other than as expressly permitted pursuant to this Agreement. Without limiting the foregoing, Licensee understands that it may not use any Trademark on or in connection with any interactive computer network, including the Internet, in any way, including as a domain name (URL) or website name, in the name of its company, or in any way that might mislead the public, and Licensee may not maintain or use any Internet presence or Internet-based advertising to promote the Trademarks, Material or Local Edition. Licensee may not sell or distribute the Local Edition or any portion thereof electronically. In the event that Licensee wishes to use the Trademarks on its letterhead or business cards, it may do so only in conjunction with the name of Licensee, the symbol ® must be included next to any use of the Trademarks and must be repeated at the foot of the letterhead or business cards together with the following statement, as applicable: "[RUNWAY] is used with permission of the trademark owner", use of the Trademarks may not suggest that Licensee, its officers or employees are carrying on business under that name, and any proposed letterhead or business cards using the Trademarks must be in a form previously approved in writing by Licensor.

f. Licensee agrees that all of its uses of the Trademarks under this Agreement, and of any other marks used in conjunction with the Trademarks, and any goodwill relating to the use of the Trademarks, shall inure to the sole benefit of Licensor. Licensee shall execute any documents Licensor may require to transfer to, or confirm ownership by, Licensor of any such Trademarks and marks and irrevocably authorizes Licensor to do same in the name of Licensee. If required by local law, pursuant to an appropriate Registered User Agreement which shall not be executed or filed without Licensor's prior approval, Licensee shall be named as a registered user of the Trademarks in the Territory and supply Licensor with copies of all such registrations. Licensee's status as a registered user shall be terminated upon expiration or termination of the Agreement for any reason or cause whatsoever and Licensor shall have the right to end this status unilaterally without the cooperation of Licensee being required. Licensee hereby irrevocably appoints Licensor as its attorney-in-fact to execute all documents and do all things necessary for this purpose.

3

g. Licensee understands and agrees that Licensor has the continuing right to import into and promote within the Territory for sale to the public copies of one or more of the English language editions of RUNWAY ' magazine' published in the United States by, or at the direction of, Licensor, and also to establish and maintain local editions in the Territory in languages other than the Language.

h. Licensee and Licensor agree that if requested by Licensor, they shall enter into any other agreement and execute any other documents required by the local laws of the Territory to effectuate the purpose of this Agreement.

i. Licensee warrants and represents that: it is a corporation duly organized, validly existing and in good standing under the laws of the Territory or its jurisdiction of incorporation set forth in Schedule 8 of the Business Terms attached hereto; it has full corporate and other power and authority to enter into and perform fully this Agreement, and has provided, or will upon Licensor's request provide, Licensor with documentary proof of same, and the opinion of its counsel attesting thereto; Set forth in Schedule 13 of the Business Terms attached hereto is a list of the beneficial ownership, directorships and officers of Licensee, which Licensee warrants to be true and correct; all governmental approvals and permissions throughout the Territory necessary for the publication of the Local Edition have been obtained and Licensee shall provide within five (5) business days of its receipt of a fully executed copy of this Agreement proof of same in a written form satisfactory to Licensor.

j. Licensor contemplates that it may from time to time be necessary or useful for Licensor to disclose to Licensee certain Know-How, written and oral information, data and documents, current and proposed business plans, practices and relationships, financial and operational data and other proprietary information of Licensor and its parents, and their respective affiliates (collectively, "Licensor's Information"). Licensee agrees to keep Licensor's Information strictly confidential and not to use it except as necessary for purposes of this Agreement. In the event Licensee must by law disclose any of Licensor's Information, Licensee shall give Licensor ten (10) business days notice so Licensor may obtain a protective order or other appropriate remedy concerning any such disclosure; provided that if Licensee must by law disclose Licensor's Information within a shorter period of time, it shall give Licensor as much notice as possible. Licensee shall cooperate fully with Licensor in efforts to obtain a protective order or other appropriate remedy at Licensor's request and expense. If Licensor so requests, Licensee promptly shall return to Licensor or destroy or irretrievably delete if in electronic form any and all of Licensor's Information, and documents which contain such information, together with all copies, extracts, notes or summaries.

k. Licensor grants no license to the software used to broadcast/distribute/program local content. Licensee must provide their own equipment and software to broadcast/print/design and media source which is licensed. All applications programed for use of distribution in tablet or interactive device will be approved by Runway Media 30 days prior to launch. All direct shopping links for direct product sales via new technology, available to licensee after invention, shall be negotiated later through Runway Media United States server systems for

4

processing and delivery if technology is acquired from licensor or third party source.

l.  Licensor may not remove integrated displayed or web information from broadcast/print programing. Designer links may be required to air certain fashion shows, therefore removal is prohibited.

m. Licensee is responsible for all broadcast/delivery fees and any fees incurred in delivery of the broadcast/feed or publication.

n.  Licensor is responsible to supply the broadcast feed via direct connection via internet to company's internet server. If other technology besides internet connection is needed such as satellite linkup/fiber optic feed/ etc., licensor is responsible to purchase and maintain additional equipment requested for uplink. Monthly fees associated for these specialty service requested are also the responsibility of the licensee.

2. TERM

a.  The Term of this Agreement shall commence upon execution by both parties hereto and continue for the period set forth in Schedule 9 of the Business Terms attached hereto calculated from the date on which the first publication/broadcast of the Local Edition is generally available on newsstands throughout the Territory (the "Release Date") (each twelve month period following the Release Date is hereinafter a "License Year"), unless sooner terminated in accordance with the terms herein. Licensee shall notify Licensor of the Release Date at least thirty (30) days prior its occurrence.

b.  Licensee shall release the first issue of the Local Edition by the date set forth in Schedule 10 of the Business Terms attached hereto, and thereafter monthly throughout the Term hereof.  Time is of the essence of this obligation.  This Agreement has been entered into on the condition subsequent that Licensee release the first issue by said date, and will be terminable immediately if Licensee does not timely fulfill this condition.  Should such termination occur, and without limiting other remedies available to Licensor, Licensor shall be entitled to retain all sums paid by Licensee to date.  Notwithstanding the foregoing, Licensor may agree in writing to extend the time for publication of the first issue, in Licensor's sole discretion.

3. ROYALTIES AND FEES

a.  In consideration of the rights licensed by Licensor under this Agreement, Licensee shall pay to Licensor the fees and royalties set forth in Schedule 11 of the Business Terms attached hereto.

b.  The Minimum Guaranteed Royalties set forth herein are due and payable by Licensee in advance of publication/broadcast, on a quarterly basis, so that Licensor receives payment for all issues published during each calendar quarter, or any portion thereof, on or before the first day of each calendar quarter (1 January, 1 April, 1 July and 1 October).

c. For each issue published, Licensee shall furnish to Licensor, on the same date that the Minimum Guaranteed Royalties are due under Section 3. Paragraph b. above, a carefully and completely filled in royalty statement in the form provided in Exhibit 1 to this Agreement.

Since final gross circulation revenues will not yet be available, projected figures will need to be used when completing the royalty statement. Any royalty's payable above that of the Minimum Guaranteed Royalties will be deemed Excess Royalties and same shall be remitted in arrears for each quarter along with the Monthly Minimum Royalties for the following quarter.

An issue's gross circulation revenues will be considered Final Sales six (6) months from its off-sale date. As issues become final, Licensee will update the royalty statement for that issue to reflect the final gross circulation revenues, and shall immediately furnish the updated statement to Licensor. Licensee will include any amounts due, or overpaid, for that issue in the next quarterly royalty payment. Once a history of final sales is developed, the average sale percentage of the last three issues to become final should be used for projecting gross circulation revenues.

For the avoidance of doubt, the payment and reporting schedule set forth herein is as follows:

| Due on or Before | Minimum Guaranteed Royalty | Excess Royalty | Royalty Statement |
|---|---|---|---|
| 1 January | For 1st Quarter | For Previous 4th Quarter | 1st and Previous 4th Quarter |
| 1 April | For 2nd Quarter | For Previous 1st Quarter | 2nd and Previous 1st Quarter |
| 1 July | For 3rd Quarter | For Previous 2nd Quarter | 3rd Quarter and Previous 2nd Quarter |
| 1 October | For 4th Quarter | For Previous 3rd Quarter | 4th Quarter and Previous 3rd Quarter |

d. All payments made by Licensee to Licensor shall be in the form of a wire transfer to Licensor at the bank set forth in Schedule 12 of the Business Terms attached hereto, or to such other account as Licensor may give notice of pursuant to Section 10. Paragraph b. below.

e. Licensee shall be solely responsible for remitting all and any taxes, fees or charges of any kind levied by any national or local government, or government unit or any administrative agency in the Territory so that all monies remitted to Licensor hereunder shall be free and clear of any such costs or expenses. In the event that a local income tax or withholding tax is assessed against Licensor by the government of the Territory, Licensee shall promptly furnish Licensor with a receipt for such income tax payment in form suited to Licensor's claim for foreign tax credit under the United States Internal Revenue Code, as Licensor may prescribe from time to time.

f. Licensee shall pay to Licensor a late fee of ten percent (10%) on all past due payments. Such late fee shall be payable together with Licensee's remittance.

g. If Licensee requests printed reproduction materials pursuant to Section 6. Paragraph a., Licensee shall prepay Licensor the sum of forty Thousand United States Dollars (USD$40,000) annually for such materials, the first payment of which shall be due upon execution of this Agreement and thereafter, each year on the anniversary date of this Agreement. This prepayment shall be adjusted to reflect the actual cost of orders requested by Licensee for issues published during each License year. That is, if the cost of materials for issues published in any given License Year exceeds forty thousand United States Dollars (USD$40,000), Licensee will be invoices in advance for such overage and will within ten (10) days pay Licensor. Licensor shall not be obligated to ship such materials until it has received payment. If the cost of materials for issues published in any given License Year is less than thirty thousand United States Dollars (USD$30,000), Licensor shall roll-over the excess amount and apply it to the prepayment for the following License Year. In the event there are sums remaining under this Section 3. Paragraph g. at the expiration or earlier termination of the Agreement, and so long as this Agreement has not been terminated for nonpayment of royalties or other fees due hereunder, said remaining sums shall be returned to Licensee.

4.   TERRITORY

If the licensed Territory IS NOT a part of the European Union (the "EU"), the following Paragraph a. applies:

a. The License granted hereby extends only to the Territory. Licensee expressly acknowledges and agrees that it is not licensed to make, or authorize any use, direct or indirect, of the Material, Know-How or Trademarks in any other area, and that it is not licensed to, and will not knowingly, sell any copies of the Local programming to persons or entities who intend or are likely to make or authorize any such use or resell them in another area, to the extent this provision is permitted by the applicable law. If the licensed Territory IS a part of the EU, the following Paragraphs b. and c. apply:

b. Licensee will enter into a binding data protection safe harbor agreement with Licensor for at least the Term of this Agreement.

c. Except as required by Article 81 of the EEC Treaty:

   i.    The License granted hereby extends to the Territory. Licensee expressly acknowledges and agrees that it is not licensed to make, or authorize any use, direct or indirect, of the Trademarks and Materials in any other area.

   ii.   Notwithstanding the foregoing, if the Territory includes a country within the EU, Licensee may, if it receives orders from an importer within another member state of the EU, export copies of the Local Edition to other countries within the EU which are not included in the

7

Territory, provided Licensor is given thirty (30) calendar days prior written notice of the country or countries involved. Licensee may not export the Local Edition outside both the Territory and the EU unless the Local Edition is destined for ultimate delivery within the Territory or the EU.

iii.  Licensee agrees not, in any territory of the EU other than the Territory: to advertise the Local Edition, establish any depot, network or other facility for the purposes of distributing; to participate by exhibiting in any trade fair, show or exhibition; or to otherwise pursue an active sales policy of the Local Edition.

5.  QUALITY STANDARDS AND CONTROLS

a.  Licensee shall observe and maintain Licensor's standards concerning production, quality, editorial material, artwork, advertising and similar matters as such standards are illustrated by the most recent issue of the Magazine/broadcast, a copy of which is attached hereto as Exhibit 2   Licensor shall give due consideration to Licensee's views respecting local standards, but Licensor shall have final and absolute control over the establishment or modification of all standards. Licensee recognizes and agrees that the Magazine/broadcast has a first class international reputation of the highest quality and caliber, which reputation Licensee agrees to maintain in its production, sale and advertising of the Local Edition.

b.  In order to assure maintenance of standards described above, Licensee shall provide to, and assure receipt by, Licensor, at least ten (10) business days prior to the scheduled date of printing of the first issue of the Local Edition, a complete mockup of the issue as it is intended for print for Licensor's approval. Licensee agrees that it shall not print the first issue until it receives Licensor's approval in writing; should Licensor's written approval not be received within ten (10) business days of actual receipt by Licensor of the dummy or similar mockup of the first issue of the Local Edition, the issue shall be considered approved.

c.  Licensee, at its sole expense, shall provide Licensor, within five (5) business days after the on sale date of every issue of the Local Edition, with fifteen (15) copies of the issue as published.  In the event that Licensor is not in receipt of such copies within said five (5) business day period, without limiting Licensor's right to terminate this Agreement pursuant to Section 8. Paragraph a.(xii) herein, Licensor may elect to procure for itself said copies of the Local Edition through its agent in the Territory who will purchase same on Licensor's behalf. Immediately upon receipt of an invoice for same from Licensor, Licensee shall pay to Licensor the sum of One Thousand United States Dollars (US$1,000.00) to cover the costs incurred thereby.

d.  If Licensor determines that the standards of quality of the Local Edition/programming  are inferior to those exemplified by the media source, Licensor shall provide written notice to Licensee citing the failure of Licensee to maintain quality control standards satisfactory to Licensor and setting forth those

8

areas in which the Local Edition is in need of improvement, including, but not limited to, production, content, format, printing, artwork, graphic and editorial matter ("Quality Notice"). If Licensor determines, in its sole discretion after sending a Quality Notice and providing Licensee with an opportunity to take such steps as Licensor shall require to cause the standards of quality of the Local Edition to meet the standards of quality of the Magazine, or prior to sending such notice in the case of deterioration of the Local Edition, that the inferior quality is likely to impair the value or impact the reputation or goodwill of the Trademarks, Licensor may send, at Licensee's expense, a qualified person to assist Licensee in raising the quality standards of the Local Edition to the level of those exemplified by the Magazine. Licensee shall pay for all relevant travel and subsistence expenses of any persons sent under this paragraph, as well as such persons' pro-rated salaries or consulting fees for the time spent working with Licensee on raising the quality of the Local Edition. The sending of a Quality Notice and/or a person under this paragraph and/or the rendition of advice to Licensee shall not waive Licensor's rights to terminate this Agreement for poor quality.

e . Licensor shall have the right, upon appropriate notice and by persons of its choice, to inspect and review all locations where Local Editions of the Magazine/broadcast center are held, printed, created, broadcasted, distributed or published, and Licensee shall provide information regarding such locations immediately upon Licensor's request.

f . During the Term of this Agreement, and for two (2) years thereafter, Licensee shall keep accurate books and records relating to all aspects of the creation, publication, distribution and sales of the Local Edition/programming including circulation figures, cost of producing and publishing the Local Edition, advertising revenues, rate card information and revenues from circulation. Such books and records shall be kept at Licensee's address set forth in Schedule 1 of the Business Terms attached hereto unless by Notice as provided herein Licensee informs Licensor of another location. Such information shall be available for inspection, audit and copying by Licensor or Licensor's designee upon reasonable notice during the Term of this Agreement and for two (2) years after its expiration or termination. Licensee shall cooperate fully with any audit or examination of its books and records by Licensor and Licensee shall bear the cost of such an audit or examination one time per License Year. If any examination of Licensee's books and records indicates sums due to Licensor then, without limitation of any other rights available to Licensor under this Agreement or otherwise, Licensee shall promptly pay all such sums, together with interest computed in accordance with Section 3. Paragraph f. above. If any such examination indicates sums due to Licensor in excess of five percent (5%) of the sums paid to Licensor for any accounting, then, without limiting any of Licensor's other rights under this Agreement or otherwise, Licensee shall promptly pay or reimburse Licensor for all costs of such examination.

g . Licensee shall, within ten (10) days of receipt of an invoice, reimburse Licensor for the travel and accommodation expenses for an annual trip by one representative of Licensor to Licensee's Territory for the purpose of conducting an on-site inspection of Licensee's production, editorial and advertising

9

operations, as well as observing distribution and other Magazine operations in the Territory.

h.  Licensee, for itself and all of its employees, representatives or agents, shall insure that all Know-How and confidential, proprietary and other information revealed by or on behalf of Licensor shall not be divulged to others or published, and shall be kept confidential and proprietary.

i.  Licensee agrees that it will not, during the Term of this Agreement, or any time after the expiration or termination of this Agreement, do anything or permit anything to be done which would dispute or contravene Licensor's ownership of, or impair any right, title or interest of Licensor in or to the Trademarks, Material or Know-How, and will not itself register or assist others in registering the Trademarks in another's name, whether as a trademark, service mark, Internet domain name, corporate name or otherwise.  Licensee shall maintain the validity and distinctiveness of the Trademarks in every issue of the Local Edition and in all advertisements, promotional materials and matters of any kind relating thereto. Licensee further will not use or permit the use of any other brand name, trademark or design to be used in connection with the Trademarks in such a way as to diminish the distinctive and proprietary nature of the Trademarks.  Licensee will not use or permit use of any of the Trademarks (or any designation incorporating the Trademarks, or any designations similar thereto or derived therefrom) in any co-branding or joint branding context without the Licensor's prior written consent, or combine the Trademarks with other words or devices so as to create a unitary mark, combined mark or joint mark based on the Trademarks.  Licensee shall use the Trademarks only in the forms Licensor has authorized in advance and in writing, and Licensee shall not use or permit use of an abbreviated or otherwise altered form of any of the Trademarks.  Licensee's use of the Trademarks shall be consistent with Licensor's Trademark Style Guide as and to the extent provided to Licensee from time to time during the Term. Licensee will not do anything or fail to do anything that does, will or is likely to diminish the rights of the Licensor in the Trademarks, or to impair any registration of the Trademarks, or to endanger the value or validity of any of the Trademarks, or to bring any of the Trademarks into disrepute, or to jeopardize any regulatory or other relevant consents, permits or approvals relating to the Local Edition or other products or services.  Licensee will not use or permit use of any of the Trademarks (or any designation incorporating the Trademarks, or any designations similar thereto or derived therefrom) as or as a part of its corporate or business name, domain name, trade name, or trading style or as part of the name of any entity connected with it.  Licensee will not oppose, cancel, or seek to oppose or cancel, or otherwise challenge the Trademarks or their validity, scope and enforceability or Licensor's rights therein.

j.  During the Term of this Agreement and thereafter, Licensee shall neither do nor fail to do any act or writing which is necessary to further ensure Licensor's exclusive right and title in the Trademarks, Material and Know-How.  Should Licensee, by operation of law or other means, obtain any right, title or interest in or to the Trademarks (and/or all goodwill associated therewith), Material or Know-How, Licensee shall and hereby does irrevocably assign to Licensor all of

10

its right, title and interest therein, and Licensee shall execute a formal assignment of the same to Licensor upon the occurrence of any such event, failing which Licensee hereby designates Licensor its true and lawful attorney-in-fact to, execute such instrument if Licensee does not do so within ten (10) days of Licensor's request.

k. Further, Licensee agrees to notify Licensor within five (5) days in writing of any actual, suspected or apparent infringement or breach of the Trademarks, copyrights or other rights as shall come to the attention of Licensee. Licensor shall take that action in regard to such infringement or breach as Licensor chooses, in its sole discretion. Licensor shall, in its sole and absolute discretion, decide whether to undertake or conduct any suit or assert any claim with respect to such infringement or breach; but Licensee shall, upon notice from Licensor and pursuant to Licensor's instructions, vigorously handle, undertake and conduct any such suit or assert any such claim at Licensor's expense in the name of Licensor, or Licensee or in both names as Licensor may direct. Licensee expressly covenants that no compromise or settlement of any such suit or claim, or any preliminary negotiations with respect to any compromise or settlement, shall be made or entered into without the prior written approval of Licensor. Licensee may share in any damage recovery obtained by Licensor as a result of any such suit or claim only if Licensee notified Licensor upon the initiation of such suit or claim of Licensee's desire to participate financially in such suit or claim and only in an amount that shall bear the same ratio to the damage recovery as the amount of Licensee's financial participation bears to the total costs and expenses incurred by Licensor in obtaining such damage recovery. In no event shall Licensor be responsible to Licensee for any consequential damages that may result from such infringement or breach. In furtherance and not in limitation of the above, it is specifically understood and agreed that Licensor shall not be liable to Licensee for the unauthorized use of the Trademarks and/or Materials in the Territory, by any third party, including, but not limited to, other licensees of Licensor.

6. <u>USE OF MATERIAL FROM THE MAGAZINE/OTHER LOCAL EDITIONS/ THIS LOCAL EDITION/ BROADCAST</u>

a. Subject to Section 1. Paragraph c., and Licensor's reprint, secondary or Language rights and its contractual arrangements and/or copyright agreements with its contributors, Licensor shall make available to Licensee Material prepared by or for Licensor for publication in the Magazine/broadcast as Licensee shall select, together with such reproduction materials as may be necessary for such purpose. Licensee may also use such Material in advertising the Local Edition/broadcast subject to Licensor's quality standards and prior written approval and shall, by the last day of each month, deliver copies of all advertisements of the Local Edition which have been proposed or appeared during the preceding month to Licensor. Upon the termination or expiration of this License all reproduction material supplied to Licensee will, at Licensor's option, either be returned without cost to Licensor or destroyed.

b. Licensee shall use its best efforts to create, at Licensee's sole cost and expense, new content localized, customized and/or tailored to the Territory, in the

11

Language (the "Localized Content") and, subject to Licensor's approval, to feature such Localized Content in the Local Edition. Licensee shall make the Localized Content available to Licensor as Licensor shall select. Licensee agrees that it will procure all rights, including the copyrights, in and to the Localized Content so that same may be published/broadcast and republished by Licensor on its www.RUNWAYFRANCE.com website, in the Magazine/broadcast and/or in any other local edition of the Magazine/broadcast, in any language or territory in the world. For all photographs/video purchased and/or commissioned for publication in the Local Edition depicting and/or taken from photographs/video and/or motion pictures depicting, actual (not simulated) sexual acts, and that are or were taken after 3 July 1995, Licensee shall fully comply with the Child Protection Restoration and Penalties Enhancement Act of 1990, 18 USC § 2257 and its accompanying regulations and 28 CFR § 75.1 - 75.8, as amended, (the "Record Keeping Act"), as if Licensee were publishing a magazine in the United States and/or a magazine for distribution in the United States. In addition, as to each person appearing in any of the photographs (whether or not the photograph is subject to the Record Keeping Act), Licensee shall obtain a fully and properly executed Release, Authorization and Agreement in the form annexed hereto as Exhibit 3. Licensee shall deliver to Licensor all paperwork and substantiation required by the Record Keeping Act, along with executed Release, Authorization and Agreement agreements, and proof that Licensee either owns the copyright in any such Localized Content or holds a valid license from the copyright owner sufficient to permit the uses contemplated herein within five (5) days of Licensor's request for same.

c. In order to fully exploit the rights granted herein, Licensee may prepare translations of the Material into the Language for inclusion in the Localized Content and shall ensure that the fundamental meaning of any Material used is not changed or distorted through its translation and/or use in the Local Edition. Licensor may prepare translations of the Localized Content for inclusion on the Licensor's Web Site, or in the Magazine or any other local editions of the Magazine.

d. Licensee shall use the Material and publish the Local Edition in accordance with all applicable Laws of the Territory, including, but not limited to, all applicable laws regarding obscenity, indecency or other regulation of depiction of sexual conduct.

e. All reproduction materials supplied by either party hereto shall be transmitted in the best available format as determined solely by the sending party, at the request and expense of the requesting party. All duties are to be paid by the receiver.

7. ADVERTISING

a. NA

8. TERMINATION – TEMPORAY 3 MONTHS

a. Notwithstanding the provisions of Section 2 of this Agreement, this Agreement shall terminate immediately upon written notice by Licensor to Licensee effective

12

on the date specified in such notice should one or more of the following circumstances occur which is not remedied within thirty (30) calendar days of notice stating in detail such circumstance or within such other period of time specifically provided in this Agreement for the curing of such circumstance:

i.  Licensee shall become insolvent, go into liquidation or receivership, have a receiver appointed, or be admitted to the benefits of any procedure for the settlement of debts or be declared bankrupt;

ii.  The initial fee which is due pursuant to Section 3. Paragraph a. herein is not received by Licensor within three (3) business days of the signing of this Agreement;

iii.  Licensee fails to publish twelve (4) issues of the Local Edition in any License Year, and/or more than sixty (12 0) days elapse between the on-sale dates of any two consecutive issues;

iv.  Licensee fails to pay royalties, fees or other sums payable hereunder when due, such failure continuing for a period of thirty (30) calendar days thereafter;

v.  Licensee becomes subject to any law or regulation or other condition which prevents remittance in United States dollars to the United States of the royalties, fees or other sums payable to Licensor under this Agreement;

vi.  Licensee fails to comply strictly with the quality standard set out in this Agreement;

vii.  Licensee fails to submit a quarterly statement in the form set forth in Exhibit 1 within thirty (30) calendar days of its due date;

viii.  Failure by Licensee to submit to Licensor copies of all and any withholding tax receipts as required under Section 3. Paragraph e. herein;

ix.  Without Licensor's prior written consent, Licensee makes or purports to make    an assignment, sublicense, or other transfer, in whole or in part of this Agreement;

x.  Licensee's breach of the promises and provisions of Section 5. Paragraph h. herein;

xi.  A change in the beneficial ownership, directorships and officers of Licensee as set forth in Section 1. Paragraph i. herein without Licensor's prior written consent as provided therein;

xii.  Licensee fails to provide Licensor with fifteen (15) copies of each Local Edition as required under Section 5. Paragraph c. herein.

13

And this Agreement shall also terminate upon written notice by the party not in breach to the other party effective on the date specified in such notice should there be:

      xiii.  Arrearages of more than thirty (30) days by Licensee in its obligations to the printer and/or Licensee's other vendors providing goods and services in connection with the Local Edition in the Territory or otherwise in connection with Licensee's performance of this Agreement.

      xiv.  Failure by Licensee to pay all applicable premiums for and retain insurance required by this Agreement.

      xv.  Licensee, or any principal Licensee, including any officer or director, is convicted of a criminal offense.

  b.  Either party may terminate this Agreement at any time by giving five (1) months prior written notice to the other party as provided in Section 10. Paragraph b.

  c.  Upon expiration or termination of this Agreement for any reason, Licensee shall not be entitled to any further use of the Trademarks, Materials or Know-How and permanently shall cease all uses thereof.

  d.  Licensee shall have the following additional obligations upon expiration, or termination for any reason, of this Agreement:

      i.  To pay within ten (10) days to Licensor all monies due and owing for royalties or for any other reason;

      ii.  To deliver to Licensor a full accounting, in the form prescribed in Exhibit 1, and on the dates indicated in Section 3. Paragraph c.;

      iii.  To deliver within ten (10) days to Licensor, without charge, all materials, documents and information which were developed in connection with the License granted under this Agreement or which are the property of Licensor;

      iv.  To deliver to Licensor within sixty (60) days before the expiration of this Agreement or within ten (10) days after the termination of this Agreement, a certified statement of Licensee's Chief Financial Officer (or analogous officer), showing the number, location and description of all copies of any copy of the Local Edition presently in Licensee's or its distributors' possession;

      v.  To execute within (10) days such documents as Licensor may request in order to vest fully in Licensor all rights to the Material, the Trademarks, to any other copyrighted material, and any Know-How, failing which Licensee hereby irrevocably appoints Licensor as its attorney-in-fact to execute all documents and do all things necessary for this purpose.

  e.  In conjunction with the rights set forth in Section 5. Paragraph f. hereunder, upon the expiration or termination of this Agreement for any reason whatsoever, and

14

for a period of two (2) years thereafter, Licensor shall have the right upon no less than forty-eight (48) hours notice to inspect, audit and copy Licensee's books and records and to inspect any places where Licensee and/or its distributors are holding any finished or unfinished copies of any issue of the Local Edition.

f. Licensee shall have a period of sixty (60) calendar days, after the expiration or termination of this Agreement to dispose of any copies of any issues of the Local Edition still in its possession, unless this Agreement was terminated for reasons of quality control or infringement. If this Agreement was so terminated, Licensor shall have the right to either destroy, or, have Licensee destroy at Licensee's expense, all copies of the Local Edition which do not meet Licensor's quality control standards. If this Agreement is terminated because Licensee is in default of any payment due to Licensor, then, to the extent Licensee is able to dispose of its inventory, it shall first pay over to Licensor one hundred percent (100%) of all proceeds of such sales, and provide Licensor with all relevant statements and documents, up to the amount owed to Licensor

9.   INDEMNIFICATION

a. Should any party claim infringement against Licensee with regard to Materials supplied by Licensor, Licensee shall immediately inform Licensor, which shall, at its option, either defend the claim itself at its own expense, or instruct Licensee to defend the claim in Licensee's name but for and on behalf of Licensor at Licensor's expense. Except to the extent of Licensee's own fault or liability, Licensor shall hold Licensee harmless for all costs and losses incurred, including legal fees and damages, arising out of any claim that the Materials or Trademarks, when used in accordance with the terms hereof, infringe the trademark or copyright of any third party or that any photograph has been published without the model's authorization; provided, however, that if Licensee is instructed to defend the action, all settlement offers and costs and legal fees to be incurred shall first be submitted to Licensor for approval. Nothing herein contained shall be construed to prevent Licensor from asserting any claim it has against Licensee relating to such infringement.

b. In the event Licensee's use of the Trademarks as licensed hereunder is materially restricted as being an infringement upon the trademark rights of third parties, and provided Licensee is not in default hereunder, Licensee's sole remedy shall be to terminate this Agreement upon sixty (60) calendar days prior written notice to Licensor.

c. Except as otherwise set forth in Section 9. Paragraph a., Licensee shall be entirely responsible for, and shall indemnify and hold Licensor harmless from and against any and all actions, suits, claims, proceedings, demands, tax or any other assessments or judgments brought against Licensee, Licensor or any of Licensor's affiliates or other licensees, and any and all damages, losses and costs and expenses, (including accounting fees and reasonable legal fees) of whatever nature incurred by Licensor resulting from the publication of the Local Edition by Licensee, or from any act or omission of Licensee or its agents or employees or any other event beyond Licensor's control which occurs in the Location or from

15

any breach of warranty or breach, violation or default by Licensee in the performance of any of its obligations hereunder.

d. LIMITATION OF LIABILITY. IN NO EVENT SHALL LICENSOR BE LIABLE FOR ANY INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE, SPECIAL OR CONSEQUENTIAL DAMAGES ARISING FROM OR OTHERWISE CONCERNING THIS AGREEMENT, WHETHER OR NOT THE POSSIBILITY OR LIKELIHOOD OF SUCH DAMAGES WAS KNOWN OR CONTEMPLATED.

e. Licensee shall own and maintain a publisher's liability insurance policy for such coverages in such amounts as Licensor requests, and shall have Licensor named as an additional insured under such policy of insurance, at Licensee's cost and expense, and shall provide Licensor with an endorsement from the insurance company to that effect, simultaneously with the execution of this Agreement.

10.    MISCELLANEOUS PROVISIONS

a. Assignment of Agreement. This Agreement may not be assigned, sublicensed or transferred in whole or in part by Licensee voluntarily, by stock transfer, merger, operation of law or otherwise, without the prior written consent of Licensor. Furthermore, Licensor has entered into this Agreement on the basis that the directors and principal shareholders of Licensee are persons in whom Licensor has confidence. In the event the directors of Licensee change or the present shareholders of Licensee cease to own at least eighty percent (80%) of the voting shares of stock thereof, whether by voluntary transfer or operation of law (including laws of descent and distribution), Licensor reserves the right to terminate this Agreement immediately by written notice.    Notice of any such proposed transfer of interest shall be given immediately to Licensor in writing and Licensor shall have at least three (3) months from receipt thereof to exercise its right of termination.

Licensor may assign or transfer its rights and interests hereunder at its discretion
to            any corporate entity controlled by, or under common control by, Licensor, its
parents            or affiliates and will give prompt notice of same to Licensee.   Any
purported            assignment, transfer or sublicense in violation of this Agreement
shall be void.

b. Notices. Any notice required or desired to be given under the terms of this Agreement shall be sent by fax, international courier delivery service or hand delivery. Any notice shall be deemed to be received within three (3) business days for courier and instantaneously for fax or hand delivery provided proof of receipt is obtained. All notices given to Licensor or Licensee shall be sent to the addresses set forth in Schedule 14 of the Business Terms attached hereto or to such other address provided by notice given pursuant to this paragraph.

c. Injunctive Relief. Licensee hereby acknowledges that Licensor's rights, title and interest in the Trademarks, Materials and Know-How are special, unique and of an extraordinary character and not readily compensable by monetary damages. Licensee therefore agrees that Licensor shall be entitled to an injunction to be

16

issued by any tribunal of competent jurisdiction in the Territory restricting Licensee from committing or continuing any violation of this Agreement. In a proceeding for an injunction, Licensee agrees that it will submit to the jurisdiction of the tribunal of choice of Licensor, that it shall not interpose damages as a defense to the granting of any injunction, and that it will abide by the injunction. Nothing in this Agreement, however, shall be construed as prohibiting Licensor from pursuing any other rights and remedies available to Licensor for a breach or threatened breach of this Agreement.

d.  Severability.  If any provision of this Agreement shall be held invalid or unenforceable, such invalidity or unenforceability shall not render invalid or unenforceable the remaining terms and provisions of this Agreement.

e.  Entire Agreement.  These Standard Terms and Conditions and the Business Terms/Schedules and Exhibits attached hereto contain the entire agreement between the parties (the "Agreement") and no representations are made except as expressly set forth herein, all prior representations having been merged or abandoned. This Agreement may not be modified except by a writing signed by both parties.

f.  Governing Law.  This Agreement and the rights of the parties to it shall be construed and governed by the laws of the jurisdiction set forth in Schedule 15 of the Business Terms attached hereto. Both parties agree to the exclusive jurisdiction of courts physically located in the jurisdiction set forth in Schedule 15 for the adjudication of any suit, claim or dispute concerning or arising out of this Agreement.

g.  Non-waiver of Rights.  Failure of either party to insist on performance by the other of any term or obligation hereunder shall not be construed as a waiver of that Party's right to demand such performance at a later time.

h.  Counterparts.  This Agreement may be executed in identical counterparts, all of which shall constitute one and the same instrument, and shall be deemed to have been made, executed and delivered as of the date written above.

i.  Non-compete.  During the Term of this Agreement and for a period of three (3) years from the date of its termination or expiration, Licensee shall not itself, nor shall it permit any of its officers, directors, associates, agents, employees or assigns to advertise, publish, circulate or in any manner contribute to the production advertising, publication or circulation in the Territory or the Language of any material, product or magazine that could be deemed by Licensor to be similar to, or competitive with, commercially or otherwise, the Local Edition, the Magazine or any other magazine published by Licensor, its affiliates or other licensees of local editions in other territories. This provision shall not limit any other obligations arising under other agreements between the parties or their principals or affiliates or otherwise.

j.  Other Licenses.  Nothing in this Agreement shall prevent Licensor from granting other licenses for the publication of magazines using Material, Trademarks or

17

Know-How outside of the Territory. Further, subject to Section 1. Paragraph g., nothing in this Agreement shall prevent Licensor from licensing the Material, the Trademarks or Know-How for use in connection with other products, services or media, other than magazines in the Language, within the Territory.

k. <u>Trademark Notice</u>. Licensee shall, on the mast head page of the Local Edition, show the relationship between Licensee and Licensor, and reflect ownership of the Trademarks, by placing an appropriate notice in a form designated in writing by Licensor. Licensor initially designates the following form of notice:

"_____"and related designs are trademarks of _____. and used by permission."

l. <u>Copyright Notice</u>. All issues will carry the following copyright notice, with any Variation required by Licensor:

Copyright [LICENSOR][YEAR]. All rights reserved. Portions are reprinted by permission of General Media Communications, Inc., original copyrights [YEAR OR YEARS]. No part of this publication may be reproduced in any form or by any means, electronic, mechanical, photocopying, recording or otherwise or stored in any retrieval system without the written permission of the copyright holder and the publishers.

m. <u>Force Majeure</u>. Licensee and Licensor shall be released from their obligations hereunder if either party is delayed or interrupted in, or prevented from, the performance of its obligations by reason of fire, flood, war, public disaster, strikes or labor difficulties, government enactment, regulation, or order, or any other cause beyond its control, and not caused by such party ("Event of Force Majeure"). In an Event of Force Majeure, the party so claiming shall notify the other party in writing within five (5) business days upon such occurrence, and proof of the Event of Force Majeure must be provided within fifteen (15) business days from the occurrence. Such proof shall be in a form certified by the Chamber of Commerce and Industry or any other applicable authority under the law of the state claiming the Event of Force Majeure. Should the Event of Force Majeure cease, the party claiming the force majeure shall so notify the other party within fifteen (15) business days from such time. If an Event of Force Majeure lasts for more than six (6) months, either party may terminate this Agreement upon written notice to the other as provided herein. In such case, neither party may claim damages from the other party, but the Licensee shall have the obligation to pay Licensor all and any royalties due hereunder through such time as Licensee is unable to distribute any issue of the Local Edition due to the Event of Force Majeure.

n. <u>Survival</u>. All covenants, obligations and agreements of Licensee that by their terms or by implication are to be performed in whole or in part after the expiration or termination of this Agreement shall survive such expiration or termination for any reason, including, without limitation, the following clauses, (their enumeration herein is not intended to exclude any other clauses within the scope of this paragraph): Section 1. Paragraphs d., f., g. and i., Section 5.

18

Paragraphs f., h. and j., Section 8. Paragraphs e. and f., Section 9. Paragraphs c. and d., and Section 10. Paragraphs e., j. and o.

o. <u>Binding Agreement</u>.   This Agreement shall be deemed binding immediately upon its execution by each respective authorized signatory of Licensee and Licensor.

19

## EXHIBIT 1

WORLD-WIDE TRADEMARKS AND STATEMENTS

20

**EXHIBIT 2**

**U.S. MAGAZINE**

21

**EXHIBIT 3** (page 1 of 6)

## MODEL RELEASE, AUTHORIZATION AND AGREEMENT

TITLE OF SHOOT:_____

NUMBER OF SHOOT:_____

For and in consideration of my engagement as a model by _____ , and its parents, subsidiaries and affiliates (collectively "_____"), _____ , ( "I" or "Model" ), hereby grant and convey to _____ , their legal representatives and assigns, the exclusive and absolute right and permission to own, assign, transfer, sell, copyright, use, publish, exhibit, display, manufacture, broadcast, digitize, transmit and print one or more times in and through any and all media now known or hereafter invented, and to license others to do so, in color or black and white, in conjunction with my own or a fictitious name, recordings, portraits or pictures of me and my voice, recorded in or by photography or any other media or means ("Images"), in whole or in part, heretofore taken, or taken this day, or hereafter taken, including those in which I may be distorted in character or form, and any reproduction thereof, made in any form or manner by_____ , their photographers, employees, agents, representatives or assigns, at their studio or elsewhere, for any purpose whatsoever, including promotion or advertising · for and including the use of such images on products, and for purposes of trade, and I hereby consent to the use of any printed, graphic, photographic, audio-visual, computer-generated or any other accompanying matter in any form or manner in connection with the foregoing at the sole discretion of _____ and/or its assigns. I further authorize the use of the name under which it is published in a broadcast script of an erotic nature and the broadcast and transmission of such name and script over radio, telephone, computer and television lines and services and satellite transmission systems for commercial or any other use.

I hereby waive any right to inspect or approve said Images of me and the advertising copy, and printed, graphic, photographic, audio-visual or computer-generated or other matter that may be used in conjunction therewith, or the telephone/broadcast/ satellite system script, including without limitation any fictitious or accurate biographical material, and further waive any claim that I may at any time have to the eventual use to which same may be applied.

I hereby, warrant, transfer, sell and assign all my rights, title and interest to the Images to for the consideration hereinabove and hereinafter stated.

I hereby release, discharge and agree to save harmless _____ , its owners, officers, directors, representatives and employees, and the photographer, artist, and/or cameraman, his or their representatives, assigns, employees, or any other person or corporation, partnership or other entity for whom the foregoing might be acting, including any firm publishing, transmitting, exhibiting, broadcasting and/or distributing the finished product in whole or in part, from and against any and all liability, claims, actions and/or obligations as a result of the taking, processing or reproduction of the finished product; its publication; or its distribution by any media.

As between us, I acknowledge_____'s sole right to use the trademarks " _____ ," " _____ ," and " _____ ," I will not use or authorize the use of these Marks for any commercial purpose except with the prior written permission in each instance.

In consideration for all the rights I have granted and promises made above, upon acceptance of the photographs for publication I shall be compensated as follows based on the medium of first publication:

_____: $_____

I agree that this writing is the sole and complete understanding and agreement of the parties to it with respect to the subject matter hereof, and that I am not relying on any other representations or statements, whether oral or written. In this Agreement, any reference to gender shall include the masculine and feminine, and any reference to the singular shall include the plural, wherever appropriate.

Understanding that _____ is relying thereon, I hereby warrant that I am at least eighteen (18) years of age (19 years of age if a resident of AL, NE or WY; 21 if a resident of MS) and am of lawful age to contract and am competent to contract in my own name insofar as this Agreement is concerned, and I have supplied photographic proof of identity and age.

MODEL'S INITIALS_____
PHOTOGRAPHER'S INITIALS_____
22

**FORMS OF IDENTIFICATION PROVIDED** (page 2 of 6)

**(Photocopies of each must be attached and photocopies must be signed by the model.)**

**1. Description of first form of identification:**

a. Picture Driver's License
State of issuance:_____
Date of issuance:_____
Expiration Date:_____
License Number:_____
Other information:_____

b. State Motor Vehicle Department Picture Identification Card
State of issuance:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
Other information:_____

c. United States Passport
State of issuance:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
Other information:_____

d. Other Passport
Location of issuance:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
Other information:_____

e. Military I.D. Card
Branch of Military:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
Other information:_____

f. Other
Location/Country of issuance:_____
Issuing Authority:_____
Form of Identification:_____
Date of Issuance:_____
Expiration Date:_____
Number:_____
Other Information:_____

MODEL'S INITIALS_____
PHOTOGRAPHER'S

INITIALS_____

23

2. Description **of second form of identification:**    (page 3 of 6)

a. Picture Driver's License
State of issuance:_____
Date of issuance:_____
Expiration Date:_____
License Number:_____
Other information:_____

b: State Motor Vehicle Department Picture Identification Card
State of issuance:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
**Other information:** _____

c: United States Passport
State of issuance:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
Other information:_____

d: Other Passport
Location of issuance:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
Other information:_____

e: Military I.D. Card
Branch of Military:_____
Date of issuance:_____
Expiration Date:_____
Number:_____
Other information:_____

f: Other
Location/Country of issuance:_____
Issuing Authority:_____
Form of Identification:_____
Date of Issuance:_____
Expiration Date:_____
Number:_____
Other Information:_____

MODEL'S INITIALS_____
PHOTOGRAPHER'S INITIALS_____

24

**INFORMATION ON MODEL'S NAMES MUST BE COMPLETED BELOW**     (page 4 of 6)

Full, current, legal name of model: _____

1. Maiden Name(if applicable): _____

2. All past legal names

a. Previous Married Names: _____

_____

_____

b. Nicknames: _____

_____

_____

c. Other Legal Names: _____

_____

_____

d. Past and Present Stage Names: _____

_____

_____

e. Past and Present Professional Names: _____

_____

_____

f. Other Names: _____

_____

_____

THIS AGREEMENT AND THE RIGHTS OF THE PARTIES TO IT ARE TO BE CONSTRUED AND GOVERNED BY THE LAWS OF APPLICABLE TO CONTRACTS TO BE PERFORMED ENTIRELY IN THAT STATE. ANY LAWSUIT ARISING OUT OF THIS AGREEMENT SHALL BE BROUGHT ONLY IN COURTS PHYSICALLY LOCATED IN _____, AND BOTH THE MODEL AND CONSENT TO THE EXCLUSIVE JURISDICTION AND PROCESS OF SUCH COURTS.

CERTIFICATION OF MODEL

I HAVE THOROUGHLY AND CAREFULLY READ THE FOREGOING RELEASE, AUTHORIZATION AND AGREEMENT BEFORE SIGNING BELOW. I FULLY UNDERSTAND THIS DOCUMENT AND INTEND TO BE LEGALLY BOUND BY ALL ITS TERMS AND CONDITIONS

UNDER PENALTY OF PERJURY, I SWEAR THAT ALL THE INFORMATION PROVIDED ON THIS FORM IS TRUE, COMPLETE, AND CORRECT AS OF THE DATE BELOW, AND THAT EACH OF THE IDENTIFICATION DOCUMENTS WHICH I HAVE PROVIDED AND OF WHICH I HAVE SIGNED THE ATTACHED COPY WAS LAWFULLY OBTAINED BY ME AND HAS NOT BEEN FORGED OR ALTERED.

_____     _____
Signature Of Model(Legal Name)       Date

Model's Phone Number: (     )
_____     _____
Social Security Number

Date of Birth: Mo.   /Date   /Yr.   /     _____
                                          Model's Address

**MODEL'S CERTIFICATION OF EXEMPTION**     (page 5 of 6)

25

**18 U.S.C. § 2257 AND 75 C.F.R. (a) (2)**

I , THE UNDERSIGNED MODEL, KNOWING THAT _____ AND THE
PHOTOGRAPHER ARE RELYING THEREON, HEREBY CERTIFY AS FOLLOWS:

1. I am the model identified in and who executed the above Model Release, Authorization and Agreement ("Release").

2. The images covered by the Release in which I appear do not contain "actual sexually explicit conduct" as defined in 18 U.S.C. § 2257 (h) by me:  any conduct in which I engaged resembling such conduct was merely simulated,  at the direction of the photographer or the photographer's assistants.

_____
Model's Signature

_____
Model's Name (Print)

WITNESS:    _____
            Witness's Signature

            _____
            Witness Name (Print)

26

## VIDEOORGAPHER/PHOTOGRAPHER'S WARRANTY/CERTIFICATION: (page 6 of 6)

I, THE PHOTOGRAPHER OF THE IMAGES COVERED BY THIS RELEASE, KNOWING THAT IS RELYING THEREON, UNDER PENALTY OF PERJURY, HEREBY CERTIFY AND WARRANT THAT:

1. I PERSONALLY EXAMINED THE ORIGINAL OF THE IDENTIFICATION DOCUMENTS, OF WHICH COPIES ARE ATTACHED HERETO SIGNED BY THE MODEL, TO ASCERTAIN THE IDENTITY OF THE MODEL,

2. I PERSONALLY ASKED THE MODEL TO LIST EACH NAME BY WHICH SUCH MODEL HAS EVER BEEN KNOWN AND THE MODEL'S RESPONSES ARE CONTAINED HEREON:  3. THE IMAGES COVERED BY THIS RELEASE WERE CREATED ON THE FOLLOWING DATE(S):

_____

_____

_____

### AND

### 4. EITHER:

(a)___ / I have appropriately indicated each image depicting actual (not simulated) sexually explicit conduct as defined in 18 U.S.C.§ 2257 (h) .

Image Number(s) or other identifying code/ Date Taken:

_____

_____

_____

### OR

(b)___ / No conduct engaged in by the model who signed this release was "actual sexually explicit conduct" as defined in 18 U.S.C. § 2257 (h) but was merely simulated in accordance with the instructions of myself or my assistants.

_____

Photographer's Signature

_____

Photographer's Name (Print)

_____

_____

Photographer's Address

_____

Photographer's Phone Number

_____

Witness's Signature

_____

Witness's Name (Print)

_____

Witness's Address

27

Exhibit "L"

**William Goldstein**

| | |
|---|---|
| **From:** | RUNWAY <editor@runway.net> |
| **Sent:** | Wednesday, February 21, 2018 4:23 PM |
| **To:** | Julia Perry Style; EJ@redrockla.com; jbrooks@redrockla.com |
| **Cc:** | William Goldstein; Brad Axelrod |
| **Subject:** | Re: ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊ |

Hello,

RUNWAY's atomies are Brad Axelrod, William Goldstein and Michael Cohen.

The email sent is absolutely false, we are suing Mrs. Degrey as she licensed the name from us, filed it illegally in France.

I assure you she has 0 legal rights, in fact she will be having to answer in front of a judge after we serve her which is in progress.

Her licensed is expired and sending threatening emails doesn't get her out of her bill no matter what she thinks.

After you properly research the trademark by going to www.UPSTO.gov and looking it up, then please call Brad at 310-666-0333 for any more clarification needed.

RUNWAY® - 4449667
RUNWAY BEAUTY® - 3434722
RUNWAY TV® - 3872255
RUNWAY NEWS® - 3964775

I have been shooting with Anderson for 8 years, I am obviously the owner ask Liza.

Thank you,

Vincent Mazzotta
Head of Network
**RUNWAY® – RUNWAY TV®**

This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error

please notify the system manager. This message contains confidential information and is intended only for the individual named. If you are not the named addressee you should not disseminate, distribute or copy this e-mail. Please notify the sender immediately by e-mail if you have received this e-mail by mistake and delete this e-mail from your system. If you are not the intended recipient you are notified that disclosing, copying, distributing or taking any action in reliance on the contents of this information is strictly prohibited.

**From:** Julia Perry Style <julia@juliaperrystyle.com>
**Date:** Wednesday, February 21, 2018 at 3:41 PM
**To:** RUNWAY <editor@runway.net>
**Subject:** Fwd: ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊

Julia Perry Style
www.juliaperrystyle.com
Julia@juliaperrystyle.com
310.599.0099

Begin forwarded message:

> **From:** Anderson Group Public Relations <agpr@andersongrouppr.com>
> **Date:** February 21, 2018 at 3:37:21 PM PST
> **To:** 'Julia Perry Style' <julia@juliaperrystyle.com>
> **Cc:** 'Jeffery Brooks' <jbrooks@redrockla.com>, 'EJ' <EJ@redrockla.com>
> **Subject:** FW: ◊ **Unauthorized Use of RUNWAY MAGAZINE Intellectual Property** ◊
>
> Julia,
>
> Per our conversation, please have your attorney's write to us explaining this situation and next steps that we should be aware of, as we will need to ensure that Peta Murgatroyd is clear of any legal ramifications.
>
> Julian Allen



2

\*\*Offices located in LA & NYC\*\*
8060 Melrose Avenue
4th Floor
Los Angeles, CA 90046
Email: AGPR@AndersonGroupPR.com
O: 323.655.1008
F: 323.852.1740

---

NOTE: This message contains information which may be confidential and/or privileged. It is intended solely for the addressee. If you are not the intended recipient, you may not use, copy, distribute, or disclose any information contained in the message. Thank you.

**From:** Jeffery Brooks [mailto:jbrooks@redrockla.com]
**Sent:** Wednesday, February 21, 2018 3:01 PM
**To:** agpr@andersongrouppr.com
**Subject:** Fwd: ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊

Jeffery Brooks | President

149 E Santa Anita Ave  Burbank CA  91502
818.953.2225 Office | 818.953.2858 Fax
jbrooks@redrockla.com | www.redrockla.com

Begin forwarded message:

> **From:** Legal Department RUNWAY MAGAZINE
> <legalrunwaymagazine@gmail.com>
> **Date:** February 21, 2018 at 2:53:46 PM PST
> **To:** jbrooks@redrockla.com, RUNWAY MAGAZINE
> <infodegray@gmail.com>
> **Subject:** ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊
>
> Dear all,

3

We are writing to you on behalf of **RUNWAY MAGAZINE**.  RUNWAY
MAGAZINE is the exclusive owner of trademark and other intellectual
property rights. Any use of the name without an agreement with our
company is illegal.

It has come to our attention that you use a name / tag RUNWAY
MAGAZINE on social media network

https://www.instagram.com/p/BfeMz3pg7Uv/?hl=en&taken-
by=petamurgatroyd

**for editorial published without RUNWAY MAGAZINE authorization
(the "Infringing Use").**
**WE WOULD LIKE TO INFORM YOU THAT NO SUCH EDITORIALS
WERE PUBLISHED IN OUR MAGAZINE OR OUR WEB-SITE.**

The Infringing Use creates consumer confusion because users
suppose that this editorial was published in the magazine.
Accordingly, the Infringing Use violates RUNWAY MAGAZINE's
trademark rights and constitutes unfair competition under the
Lanham Act.  See 15 U.S.C. § 1114 and § 1025.

We therefore demand that you immediately:
Permanently cease all use of the RUNWAY MAGAZINE trademark on
your web-site, and your social media accounts to endorsed sales.

Should you fail to comply with the above demands by the close of
business on March 8 2018, we will consider taking all appropriate
action against you without further notice to you.

**FOR YOUR INFORMATION :**

Your editorial made for blog/ online "magazine" distributed on
Magzter in pdf format RUNWAY created by **Vincent Mazzotta**  aka
Vincent Midnight, and stylist **Julia Perry**.
Vincent Mazzotta constantly and intentionally creates confusion and
impersonate different media, including ours. **Julia Perry** supports this
intentional confusion with ourmagazine : **RUNWAY MAGAZINE -
LUXURY PRINTED EDITIONS ,** and present her blog / pdf as our
media.

4

For your information RUNWAY MAGAZINE distributed in lines Barns
& Noble in USA and WHSmith in Europe.
Please see more information here :
https://runwaymagazines.com/runway-magazine-digital-issues/

Vincent Mazzotta and Julia Perry has no ANY LEGAL RIGHTS to call
their blog **RUNWAY MAGAZINE**. Due to legal issues in the past
Vincent Mazzotta received **USPTO CASE AND DESIST** concerning use
of the name **RUNWAY MAGAZINE**. This document is publicly
available on WIPO database:
http://www.wipo.int/madrid/monitor/en/showData.jsp?ID=ROM.10
58209
1058209 - Runway Magazine
See : **CANCELLATION EFFECTED FOR ALL THE GOODS AND SERVICES
AT THE REQUEST OF AN OFFICE OF ORIGIN IN ACCORDANCE WITH
ARTICLE 6(4) OF THE AGREEMENT OF ARTICLE 6(4) OF THE
PROTOCOL : 2016 / 42 GAZ, 27.10.2016, US**

5



Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451
www.uspto.gov

### Notification of Ceasing of Effect
### According to Articles 6(3) and (4) of the Protocol

The United States Patent and Trademark Office hereby notifies the International Bureau of the ceasing of effect of the basic application/registration during the five-year period of dependency for:

**International Registration No.: 1058209**
**Holder: Runway TV, LLC – Vincent Mazzotta (CEO Of Runway TV, LLC)**
**Holder:**
**Basic application(s) and/or registration(s):**

The purpose of this letter is to announce the CEASING OF EFFECT of any goods and services not listed below based on the following action:

Basic application number 77536081 was cancelled by the USPTO on October 16, 2015, having U.S. Registration Number 3586631

It is requested that all goods and services in the International Registration be cancelled.

Sincerely,

Ebonie Horne
U.S. Patent & Trademark Office
Madrid Processing Unit
Trademark Specialist

This letter is without prejudice to RUNWAY MAGAZINE's rights and remedies, all of which are expressly reserved.

Kind regards,

6

*CONFIDENTIAL / PRIVILEGED*
*The content of this e-mail may contain privileged, confidential or otherwise restricted information and is intended solely for the use of the person or entity to which it is addressed. Copying this email or disclosing its contents to anyone other than its intended recipient is strictly prohibited under the international laws*
*In case you have received this communication in error, delete or destroy it and inform the sender*
*at legalrunwaymagazine@gmail.com*
*Official RUNWAY MAGAZINE*
*Legal Department*
*23/25 rue Jean Jacques Rousseau*
*75001 Paris*
*France*

**LEGAL DEPARTMENT**
**Media Group ELEONORA DE GRAY**
Magazines:
**RUNWAY MAGAZINE (International)**
NBC TV mini-series:
**RUNWAY MAGAZINE**



**RUNWAY MAGAZINE: runwaymagazines.com**
**RUNWAY MAGAZINE Services: runwaymagazines.net**
**RUNWAY MAGAZINE Store : runwaystore.wordpress.com**
**RUNWAY MAGAZINE Global Image Stock : runwaymagazine.global**
**LinkedIn :** linkedin.com/company/runway-magazine-europe
**Facebook :** facebook.com/runwaymagazine
**Twitter :** twitter.com/runwaymagazine
**Instagram :** instagram.com/runwaymagazines

7

**Pinterest :** pinterest.com/RUNWAYMAGAZINEINTERNATIONAL
**Tumblr : officialrunwaymagazine.tumblr.com**
**VOD on Vimeo :** vimeo.com/channels/runwaymag

Exhibit "M"

## William Goldstein

| | |
|---|---|
| **From:** | RUNWAY <runwaychief@gmail.com> |
| **Sent:** | Tuesday, February 20, 2018 3:31 PM |
| **To:** | William Goldstein; Brad Axelrod |
| **Cc:** | Julia Perry Style |
| **Subject:** | FW: ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊ |
| **Importance:** | High |

Bill,

This is ridiculous and it needs to stop.

Please handle this ASAP.


Vincent


**From:** Julia Perry Style <julia@juliaperrystyle.com>
**Date:** Tuesday, February 20, 2018 at 10:18 AM
**To:** RUNWAY <editor@runway.net>
**Subject:** Fwd: ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊

She is now including me...


---------- Forwarded message ----------
From: **Dimitry Loiseau** <dimitry@regardstylehouse.com>
Date: Tue, Feb 20, 2018 at 10:06 AM
Subject: Fwd: ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊
To: Julia Perry Style <julia@juliaperrystyle.com>

Hi Julia, please see the information below. I'm confused. Can you shed light on this?

**Regard Style House**
Dimitry Loiseau
Creative Director/ Partner
(424) 382-1143 Office
(818) 554-3576 Cell
8570 Wilshire Blvd. Suite 250
Beverly Hills, CA 90211
@RegardStyleHouse
www.regardstylehouse.com


Begin forwarded message:

1

**From:** Legal Department RUNWAY MAGAZINE <legalrunwaymagazine@gmail.com>
**Subject:** ◊ Unauthorized Use of RUNWAY MAGAZINE Intellectual Property ◊
**Date:** February 20, 2018 at 8:54:10 AM PST
**To:** info@regardstylehouse.com, RUNWAY MAGAZINE <infodegray@gmail.com>

Dear all,
We are writing to you on behalf of RUNWAY MAGAZINE. RUNWAY MAGAZINE is the exclusive owner of trademark and other intellectual property rights. Any use of the name without an agreement with our company is illegal.

It has come to our attention that you use a name / tag RUNWAY MAGAZINE on social media network

https://www.instagram.com/p/BfZckO3l6Eg/?taken-by=regardstylehouse

for editorial published without RUNWAY MAGAZINE authorization (the "Infringing Use").
WE WOULD LIKE TO INFORM YOU THAT NO SUCH EDITORIALS WERE PUBLISHED IN OUR
MAGAZINE OR OUR WEB-SITE.

The Infringing Use creates consumer confusion because users suppose that this editorial was published in the magazine. Accordingly, the Infringing Use violates RUNWAY MAGAZINE's trademark rights and constitutes unfair competition under the Lanham Act. See 15 U.S.C. § 1114 and § 1025.

We therefore demand that you immediately:
Permanently cease all use of the RUNWAY MAGAZINE trademark on your web-site, and your social media accounts to endorsed sales.

Should you fail to comply with the above demands by the close of business on March 6 2018, we will consider taking all appropriate action against you without further notice to you.

FOR YOUR INFORMATION :

Your editorial made for blog/ online "magazine" distributed on Magzter in pdf format RUNWAY created
by **Vincent Mazzotta**  aka Vincent Midnight, and stylist **Julia Perry**
Vincent Mazzotta constantly and intentionally creates confusion and impersonate different media, including
ours. **Julia Perry** supports this intentional confusion with ourmagazine : **RUNWAY MAGAZINE - LUXURY
PRINTED EDITIONS** , and present her blog / pdf as our media.
For your information RUNWAY MAGAZINE distributed in lines Barns & Noble in USA and WHSmith in Europe.
Please see more information here :
https://runwaymagazines.com/runway-magazine-digital-issues/

Vincent Mazzotta and Julia Perry has no ANY LEGAL RIGHTS to call their blog **RUNWAY MAGAZINE**. Due to
legal issues in the past Vincent Mazzotta received **USPTO CASE AND DESIST** concerning use of the
name RUNWAY MAGAZINE. This document is publicly available on WIPO database:
http://www.wipo.int/madrid/monitor/en/showData.jsp?ID=ROM.1058209
1058209 - Runway Magazine
See  CANCELLATION EFFECTED FOR ALL THE GOODS AND SERVICES AT THE REQUEST OF AN
OFFICE OF ORIGIN IN ACCORDANCE WITH ARTICLE 6(4) OF THE AGREEMENT OF ARTICLE 6(4) OF
THE PROTOCOL : 2016 / 42 GAZ, 27.10.2016, US

2



<br>

Accordin

The United States Patent and Trad
of effect of the basic application/re

**International Registration No.: 1**
**Holder: Runway TV, LLC – Vinc**
**Holder:**
**Basic application(s) and/or regist**

3

This letter is without prejudice to RUNWAY MAGAZINE's rights and remedies, all of which are expressly reserved.

Kind regards,

*CONFIDENTIAL / PRIVILEGED*
*The content of this e-mail may contain privileged, confidential or otherwise restricted information and is intended solely for the use of the person or entity*
*to which it is addressed. Copying this email or disclosing its contents to anyone other than its intended recipient is strictly prohibited under the*
*international laws*
*In case you have received this communication in error, delete or destroy it and inform the sender at* legalrunwaymagazine@gmail.com
*Official RUNWAY MAGAZINE*
*Legal Department*
*23/25 rue Jean Jacques Rousseau*
*75001 Paris*
*France*

**LEGAL DEPARTMENT**
**Media Group ELEONORA DE GRAY**
Magazines:
**RUNWAY MAGAZINE (International)**
NBC TV mini-series:
**RUNWAY MAGAZINE**



**RUNWAY MAGAZINE:** runwaymagazines.com
**RUNWAY MAGAZINE Services:** runwaymagazines.net
**RUNWAY MAGAZINE Store :** runwaystore.wordpress.com
**RUNWAY MAGAZINE Global Image Stock :** runwaymagazine.global
**LinkedIn :** linkedin.com/company/runway-magazine-de-europe
**Facebook :** facebook.com/runwaymagazine
**Twitter :** twitter.com/runwaymagazine
**Instagram :** instagram.com/runwaymagazines
**Pinterest :** pinterest.com/RUNWAYMAGAZINEINTERNATIONAL
**Tumblr :** officialrunwaymagazine.tumblr.com
**VOD on Vimeo :** vimeo.com/channels/runwaymag

--

NOTE: This message contains information which may be confidential and/or privileged. It is intended solely for the addressee. If you are not the intended recipient, you may not use, copy, distribute, or disclose any information contained in the message. If you have received this transmission in error, please notify the sender by reply e-mail and delete this message. Please note, all rights of concurrent review and comment are hereby reserved. Thank you.

Exhibit "N"

**William Goldstein**

| | |
|---|---|
| **From:** | RUNWAY <editor@runway.net> |
| **Sent:** | Tuesday, February 20, 2018 3:29 PM |
| **To:** | William Goldstein |
| **Cc:** | Brad Axelrod |
| **Subject:** | FW: Apple Inc. (our ref# APP91978) Notice of Complaint |

On 2/20/18, 11:29 AM, "App Store Notices" <AppStoreNotices@apple.com> wrote:

Dear Sir or Madam,

**\*\*Please include APP91978 in the subject line of any future correspondence on this matter.\*\***

On 2/20/2018, we received a notice from Eleonora De Gray (Official Runway Magazine) ("Complainant") that Complainant believes your apps listed below infringe its intellectual property rights.  In particular, Complainant believes you are infringing its trademark.  Please see their comments below.

You can reach Complainant through Eleonora de Gray (email: legalrunwaymagazine@gmail.com), copied on this email.  Please exchange correspondence directly with Complainant.

We look forward to receiving written assurance that your applications do not infringe Complainant's rights, or that the parties are taking steps to promptly resolve the matter.  Please keep us apprised of your progress.

Please note that during the course of this matter:

1.  Correspondence to Apple must include the reference number noted above in the subject line and copy the other party.  All correspondence sent to Apple may be shared with the other party.

2.  Written assurance of rights may include confirmation that your applications do not infringe Complainant's rights, an express authorization from Complainant, or other evidence acceptable to Apple, and should include documentation wherever possible.

3.  Should you choose to remove your applications (for example, while you make any necessary changes), visit iTunes Connect at http://itunesconnect.apple.com and access your apps in the Manage Your Application module.

- Access your app in the "My Apps" module
- Click on the "Pricing and Availability" tab from the App Summary Page and select "Edit" by "Availability"
- Select and deselect "All" territories to uncheck all App Store territories
- Click on the "Done" button

4.  Developers with a history of allegations of repeat infringement, or those who misrepresent facts to Apple and/or the Complainant are at risk of termination from the Developer Program.

5.  Failure to respond to the Complainant or to take steps toward resolving a dispute may lead to removal of the app(s) at issue as in violation of the App Store Review Guidelines and/or the iOS Developer Program License Agreement. Please keep Apple apprised of your progress.

Thank you for your immediate attention.

Developer: Runway Beauty Inc
Provider: RUNWAY BEAUTY INC
App Title: RUNWAY® LUX
Apple ID: 1227670454

Comments from Complainant: Vincent Mazzotta constantly and intentionally creates confusion and impersonate different media, including ours.

Vincent Mazzotta has no ANY LEGAL RIGHTS to call his on-line media RUNWAY MAGAZINE. Due to legal issue in the past he received USPTO CASE AND DESIST concerning use of this trademark. This document is publicly available on WIPO database:

http://www.wipo.int/madrid/monitor/en/showData.jsp?ID=ROM.1058209

no permalink available in this system for the document.

Search : 1058209 - Runway Magazine

Scroll down to the end : CANCELLATION EFFECTED FOR ALL THE GOODS AND SERVICES AT THE REQUEST OF AN OFFICE OF ORIGIN IN ACCORDANCE WITH ARTICLE 6(4) OF THE AGREEMENT OF ARTICLE 6(4) OF THE PROTOCOL : 2016 / 42 GAZ, 27.10.2016, US

-

Developer: Runway Beauty Inc
Provider: RUNWAY BEAUTY INC
App Title: RUNWAY® LUX Talent
Apple ID: 1227681301

Comments from Complainant: Vincent Mazzotta constantly and intentionally creates confusion and impersonate different media, including ours.

Vincent Mazzotta has no ANY LEGAL RIGHTS to call his on-line media RUNWAY MAGAZINE. Due to legal issue in the past he received USPTO CASE AND DESIST concerning use of this trademark. This document is publicly available on WIPO database:

http://www.wipo.int/madrid/monitor/en/showData.jsp?ID=ROM.1058209

no permalink available in this system for the document.

Search : 1058209 - Runway Magazine

Scroll down to the end : CANCELLATION EFFECTED FOR ALL THE GOODS AND SERVICES AT THE REQUEST OF AN OFFICE OF ORIGIN IN ACCORDANCE WITH ARTICLE 6(4) OF THE AGREEMENT OF ARTICLE 6(4) OF THE PROTOCOL : 2016 / 42 GAZ, 27.10.2016, US

-

Sincerely,

James

2

· iTunes Legal  Apple  One Apple Park Way Cupertino, CA 95014  AppStoreNotices@apple.com

The information in this e-mail and any attachment(s) is intended solely for the personal and confidential use of the designated recipients.  This message may be an attorney-client communication protected by privilege.  If you are not the intended recipient, you may not review, use, copy, forward, or otherwise disseminate this message.  Please notify us of the transmission error by reply e-mail and delete all copies of the message and any attachment(s) from your systems.  The use of the sender's name in this message is not intended as an electronic signature under any applicable law.  Thank you.

**PROOF OF SERVICE**

I, the undersigned, declare as follows:

I am employed in the County of Los Angeles, State of California. I am over the age of 18 years, and not a party to the within action. I am an employee of or agent for LAW OFFICES OF WILLIAM D. GOLDSTEIN, whose business address is 4030 Sawtelle Blvd., Los Angeles, CA 90066.

On **July 30, 2018** I served the foregoing document(s): FIRST AMENDED COMPLAINT, EXHIBITS IN SUPPORT OF FIRST AMENDED COMPLAINT AND PROOF OF SERVICE to the following party(ies) in this action addressed as follows:

| Elenora de Gray/EURL Elenora de Gray<br>infodegray@gmail.com | Elenora de Gray/EURL Elenora de Gray<br>23/25 Rue Jean Jacques<br>Rousseau, 75001 Paris, France |
|---|---|

☐ *(BY MAIL)* I caused a true copy of each document, placed in a sealed envelope with postage fully paid, to be placed in the United States mail at Los Angeles, California. I am "readily familiar" with this firm's business practice for collection and processing of mail, that in the ordinary course of business said document(s) would be deposited with the U.S. Postal Service on that same day. *I* understand that the service shall be presumed invalid if the postal cancellation date or postage meter date on the envelope is more than one day after the date of deposit for mailing contained in this affidavit.

☐ *(BY PERSONAL SERVICE)* I caused to be delivered each such document by hand to each addressee above.

☐ *(BY CERTIFIED MAIL – CCP §1020, et seq.)* I caused said document(s) to be deposited with the United States Mail, postage prepaid, return receipt requested, signed by addressee that said documents were received.

☒ *(BY OVERNIGHT DELIVERY)* I caused a true copy of each document, placed in a sealed envelope with delivery fees provided for, to be deposited in a box regularly maintained by U.S. Postal Service (USPS). I am readily familiar with this firm's practice for collection and processing of documents for overnight delivery and know that in the ordinary course of business practice the document(s) described above will be deposited in a box or other facility regularly maintained by USPS or delivered to a courier or driver authorized by USPS to receive documents on the same date it is placed for collection.

☐ *(BY FACSIMILE)* By use of facsimile machine number (323) 372-3589, I served a copy of the within document(s) on the above interested parties at the facsimile numbers listed above. The transmission was reported as complete and without error. The transmission report was properly issued by the transmitting facsimile machine.

☒ *(BY ELECTRONIC SERVICE)* Based on a court order or an agreement of the parties to accept service by electronic transmission, I caused the documents to be sent to the persons at their electronic notification addresses. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.

Executed on **July 30, 2018,** in Los Angeles, CA. I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

William D. Goldstein